**Simon A. BASILE, et al., Plaintiffs,**

**v.**

**MERRILL LYNCH, PIERCE, FENNER, & SMITH, INC., Defendant and Third-Party Plaintiff,**

**v.**

**REX RAILWAYS, INC., et al., Third-Party Defendants and Third-Party Plaintiffs,**

**v.**

**MERRILL LYNCH LEASING, INC., et al., Third-Party Defendants and Third-Party Plaintiffs,**

**v.**

**Mark A. SALITAN, Third-Party Defendant.**

Nos. C–1–82–740, C–1–82–748, C–1–82–774, C–1–82–857, C–1–82–1012 and C–1–83–1591.

United States District Court, S.D. Ohio, W.D.

July 1, 1986.

James B. Helmer, Jr., Timothy L. Bouscaren, Walker, Chatfield & Doan, Cincinnati, Ohio, for plaintiffs.

Donald D. Saxton, Jr., Washington, Pa., appeared at class certification hearing.

Peter L. Cassady, Cincinnati, Ohio, for plaintiff Ekstrom.

Kevin B. McCarthy, Springfield, Ill., Stanley J. Aronoff, Gregory Mohar, Cincinnati, Ohio, for Robert C. McGann, M.D.

Michael F. Haverkamp, Cincinnati, Ohio, for Merrill Lynch, Pierce, Fenner & Smith, Inc.

Mark A. Salitan, Englewood Cliffs, N.J., pro se.

Dennis J. Buckley, Cincinnati, Ohio, for Benjamin Gettler.

## OPINION AND ORDER AWARDING ATTORNEYS' FEES AND EXPENSES

SPIEGEL, District Judge.

We rule today on the matter of the Joint Application of Counsel for an Award of Attorneys' Fees and Expenses (doc. 354) that came on for a two-day hearing that commenced on April 1, 1986. Additionally we consider counsel's First Supplement filed March 28, 1986 (doc. 387) to said joint application. In the course of our deliberations we have examined over a score of pleadings that relate to the attorneys' fees question. The parties may be assured that, while we have not referenced each and every document, all pertinent materials have been read carefully and accorded due weight. All together, counsel petition the Court for $3,500,000 in attorneys' fees, as well as award of costs in the amount of $203,611.36. They maintain that the fees award requested represents $1,711,153.50 in straight-time, increased by a multiplier of approximately 2.00 or 200%, and amounts to approximately twenty-one (21%) percent of the "common fund" created.

As mentioned in our Order Approving Settlement (doc. 383), no useful purpose would be served by relating the salient facts of this class action as its history has been chronicled ably elsewhere. Some explanation, however, is appropriate concerning why the issues of settlement and award of attorneys' fees and costs were heard separately. A motion to approve settlement and an application for fees were filed in early February 1986. On February 24, 1986, a hearing on the fairness, reasonableness, and adequacy of the proposed settlement began; it closed on February 25, at which time we conditionally approved the settlement. On February 28, 1986, we handed down our formal, heretofore mentioned Order Approving Settlement. Prior to the settlement hearing, strong objection was lodged, principally by class member Benjamin Gettler, over the petitioned-for fees.[1] Because the value of the settlement had been placed at issue and because such value is the cornerstone upon which a court must base its award of fees in any "common fund" case, in the interests of justice we continued the matter of attorneys' fees to April 1.[2] It should be noted that all present at the settlement hearing agreed that the controversy over the value of the settlement mattered not in terms of approval of same, but only as to the appropriate attorneys' fee award in compensation therefor. We begin with a brief recitation of applicable law.

This litigation presents the situation of a "common-fund" case. "Charging" attorneys' fees against a common fund created has been approved by the Supreme Court to effect the so-called American Rule that each litigant bear his or her own attorney's fees and to insure that "persons who obtain the benefit of a lawsuit without contributing to its cost are [not] unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). In such cases, attorneys' fees

---

**1.** Objections in addition to those filed by Benjamin Gettler were lodged in this case. In large part, the objections questioned award of $3,500,-000 in attorneys' fees in general, or considering the fact that class counsel's efforts produced a cash fund of only $5,700,000. *See, e.g.,* docs. 358, 364, 366, 368, 369, 385, 386, 399 and 401. It is the Court's understanding that, while objectors Robert and Emma Kolpek and Donald D. Saxton, Sr. made their individual presence known, they essentially joined forces with Objector Gettler. Accordingly, we will concentrate on resolving those conflicts prompted by Mr. Gettler's papers and presentation of testimony.

**2.** At the commencement of the April 1 hearing, class counsel moved to strike Objector Gettler's pleadings as being untimely filed. Counsel for Objector Gettler then moved for leave to file his pleadings. We took both motions under advisement; upon reflection, we think that the interests of justice mandate that the former motion be denied, and the latter one granted. For the record we note that nearly all the objections filed technically were out-of-time. Nonetheless we have considered them all.

awards customarily are expressed in terms of a percentage of the benefit created. *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1549 n. 16, 79 L.Ed.2d 891 (1984). Typically, the percentages range from 20–50%. *See, e.g., In Re Warner Communications Securities Litigation*, 618 F.Supp. 735, 749–50 (S.D.N.Y.1985).

The factors that our parent circuit has directed we consider in formulating an award are stated in *Ramey v. The Cincinnati Enquirer, Inc.*, 508 F.2d 1188 (6th Cir.1974), *cert. denied*, 442 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975). They are as follows:

> (1) the value of the benefit rendered to the corporation or its stockholders, (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, (3) whether the services were undertaken on a contingent fee basis, (4) the value of the services on an hourly basis, (5) the complexity of the litigation, and (6) the professional skill and standing of counsel involved on both sides.

*Id.* at 1196. Having considered the merits of the joint fee application submitted by plaintiffs' attorneys, in addition to the papers filed in opposition, as well as the four[3] days of testimony relating thereto, we conclude that counsel should be compensated for nearly all hours logged, but at lower hourly rates than those requested. Further, we believe that award of a substantial multiplier is appropriate. Our reasons for so ruling will be explained within the balance of this Opinion and Order.

That the Sixth Circuit has referenced "value" as the first factor to consider in a common fund case is no surprise. Implicit in the concept of awarding a percentage of the fund created is the need to determine the value of the fund that the class will share. It was to this topic that the bulk of the testimony and argument was devoted.

All agree that the settlement has an intrinsic value of $5,700,000, the amount of cash that will be available for distribution to the class after the attorneys' fees as well as some or all of the costs have been paid. Class counsel initially maintained that the settlement value, depending on which options were elected by the class members, could reach $16,474,000. In addition to the previously-described $5,700,000, that figure was composed of a special fund to be paid to the named and intervening plaintiffs ($948,000) and of an option each class member has to sell his or her boxcars to Merrill Lynch at a price of $8,500 per car ($9,826,000).[4] Class counsel believe that the boxcars have no fair market value; hence, they view an option for each class member to sell all boxcars owned for $8,500 per car as conferring a full $9,826,000 benefit. Later, at the attorneys' fee hearing, counsel revised their estimate of the common benefit created upward to $19,150,140 to include certain savings that would attend sale of their boxcars to Merrill Lynch that ordinarily would not obtain were the boxcars sold under ordinary circumstances, assuming willing buyers could be found: a four (4%) percent commission to which Rex Railways would be entitled by virtue of the management agreement (4% of $9,826,000 = $393,040); a fifteen (15%) percent commission to which a broker well might be entitled by virtue of general industry standards (15% of $9,826,000 = $1,473,900); and mechanical inspection and relocation expenses that the seller, by virtue of general industry standards, well might be expected to bear (1156 cars × $700/car = $809,200). Class counsel supported the latter two savings through the testimony of transportation expert William J. Rennicke. They further advised the Court that the $19,150,140 figure was conservative insofar

---

3. Technically, only two days were devoted solely to the matter of attorneys' fees. However, certain testimony was taken during the two days devoted to the hearing concerning the fairness, reasonableness, and adequacy of the settlement that related to the value of the settlement. Because, as indicated below, the value of the settlement is a critical factor in measuring an appropriate fee award, all four days need to be recalled.

4. A total of 1156 boxcars are at stake in this case.

as it does not include cleaning fees that class members, as ordinary sellers, would be required to pay, again by virtue of general industry standards. Nor were resulting tax benefits figured in.

Objector Gettler, however, believes that the settlement has a value of only $5,700,-000. In support, he presented testimony to the effect that option to sell each boxcar to Merrill Lynch is worthless because the cars, taking into account the income generated and the available tax treatment, are worth more than $8,500. And, if the option to sell is valueless, then obviously the concomitant extra savings are of no benefit because no reasonable owner will exercise the option. Finally, because no class member shares in the $948,000 fund reserved for the named and intervening plaintiffs, Mr. Gettler thinks it has no place in the common-fund-created computation.

We look first to the option to sell. Essentially three avenues are available to us to value that option and thus the boxcars themselves: comparable sales, replacement cost, and capitalization of earnings thereon. Of these alternatives, the comparable sales route strikes us as the most prudent choice. In this regard, our views were influenced heavily by the testimony of the aforementioned Mr. Rennicke, an eminently qualified expert in the field of utilization of boxcars within the national transportation system. Mr. Rennicke testified that the boxcars in question are virtually obsolete given that shippers either are demanding boxcars more tailored to their products or are switching to motor carriers. Replacement cost, therefore, is an inappropriate method of valuation. Moreover, Mr. Rennicke advised that a surplus of boxcars are depressing the market and, by the time such surplus subsides, the useful life of the boxcars will have expired and they will have to be retired or extensively overhauled, a costly proposition.

All these factors lead to the conclusion that the only worth the boxcars have is in their scrap value. Between the opinions of Mr. Rennicke, witness John Miller, manager of railroad equipment for the David Joseph Co., class member John Jamison, a professional appraiser with American Appraisal Services, the largest appraisal firm in the country, and Irving S. Tick, President of the Morris Tick Company, Inc., a scrap metal business (*see* doc. 396), several figures between the zero-to-$5000 range were explored, most of which were at the low end of the scale. Thus, to a certain extent, honing in on a scrap value is problematic. But having studied the matter for some three months, we find a scrap figure of $2,500 per car to be reasonable, even though such a value is probably higher than what the facts warrant. In this regard, we recall the testimony that there is no scrap market, domestic or foreign, on which to dump all 1156 cars and that certain of the boxcars carried contaminated commodities such as asbestos and limestone, thus rendering them valueless even in the scrap market. Further, even though not all of the boxcars carried contaminated commodities, those that did not may be rejected on a "guilt by association" basis, particularly when, as here, it is a buyer's market.

Objectors Gettler and Kolpek urged the Court to adopt their capitalization of earnings theory, which, if accepted, would preclude any inquiry into scrap value. A detailed presentation was made for the purpose of convincing the Court that the value of the boxcars exceeds the $8,500 negotiated option. We were unimpressed, however, with this method of valuation because it assumed a scenario that might not come to fruition: for example, that demand and a steady stream of income will continue and that the Internal Revenue Service will allow the proposed tax treatment. Although Messrs. Doan and Buerger, both former Internal Revenue Service employees, testifying on behalf of the class and Objector Gettler respectively, disagreed especially as to the latter point, this Court has serious reservation over accepting a theory that may run afoul of the tax laws. Although creative and presumably appropriate for his concerns, we consider Mr. Gettler's method fraught with difficulty, dependent

as it is upon so many contingencies. Because we must look out for the class members' interest with respect to award of attorneys' fees and costs, of necessity every aspect of this matter must be viewed with a conservative eye, including Objector Gettler's theory. To engage in a colloquialism, we believe that a bird in the hand of a $6,000 ($8,500 option — $2,500 scrap value) per car option to sell, is worth two "in the bush" capitalization of earnings values as proposed by Mr. Gettler.

■ One other point in this vein should be expressed. Objector Gettler, having sought professional advice, has determined that the above-described valuation is appropriate for his personal situation. He presents no evidence as to how many class members are similarly situated. It is true that class counsel have the burden of proving the value of the settlement. But we accept their representation that most of the class members with whom they spoke over the years indicated that they wanted to sell their cars. For this reason alone, then, a value greater than zero must be accorded to the option to sell. Further, that counsel have negotiated an *option* to sell, as well as reduced management fees if the cars are retained, bespeaks their accommodation to the class as a whole, which includes Mr. Gettler who wishes to keep his cars. Plaintiffs' attorneys merit reward for their efforts to please all the class members.

■ Thus far we have determined the common benefit created to be $5,700,000 cash plus the $6,936,000 ($6,000 per car × 1156 cars) option to sell. And we believe inclusion of these two elements alone comprises the total value of the settlement. Despite the fact that the named plaintiffs begat this class action, we do not think the separate cash fund of $948,000 that they and the intervening plaintiffs will receive should be charged against the class as a whole for the purpose of determining the value of the settlement, of which a particular percentage will go to the lawyers. Fur-

ther, out of an abundance of caution, we will disregard the other "savings" that the class in theory realizes by virtue of the guaranteed option to sell their cars to Merrill Lynch: the four (4%) percent commission to Rex as well as the other expenses that well might be incurred by virtue of general industry standards. Accordingly, we find that the value of the common fund created, which serves as the cornerstone of our award of fees and costs, to be $12,636,-000.

■ Turning now to the balance of the *Ramey* factors, we note that class counsel have stated their case well. There has been no challenge, nor should there have been, to the notion that the federal (and state) securities laws are designed to promote a fair marketplace in order to protect the investing public. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668, *reh'g denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). Without question, plaintiffs' attorneys admirably "enforced" these laws against the world's largest securities brokerage firm, and merit ample compensation therefor.

■ Although the question was confused initially, the testimony adduced at the hearing satisfies the Court that this litigation proceeded on a contingent fee basis and that any letters from Attorney Bouscaren that indicate otherwise were proposals only. It is true that counsel were paid some $65,000 in attorneys' fees by the representative plaintiffs.[5] At least with respect to the $30,000 paid to Attorney Helmer's firm, such money was tendered in 1982, at the outset of the lawsuit. Since that time, this case has proceeded on a contingent fee basis. So described, any award we make should be sufficient enough to compensate counsel for the four-year risk they incurred. That this case proceeded on a contingent fee basis is of particular significance when one considers

---

**5.** Attorney Helmer has indicated that the approximate $65,000 advance will be refunded once this Court makes its award of attorneys' fees. Likewise, the $57,405.38 advanced in costs by various class members will be refunded upon our award of costs.

the small size of the firms from which class counsel hail. Given the enormous time demands imposed on the handful of attorneys involved by virtue of their commitment to this case, no doubt other business was turned away. For the Helmer firm especially, which has grown from two to four attorneys in the past four years, the risk of non-payment was indeed a serious concern. Moreover, the risk was all the more pronounced as Attorney Helmer testified that numerous attorneys were contacted to aid in the prosecution of this case, but declined to participate.

■ Value again was disputed vis-a-vis factor four, the value of counsel's services on an hourly basis. Objector Gettler urged that "national" hourly rates ought not be awarded to counsel as requested. Plaintiffs' counsel's expert, Robert A. Pitcairn, Jr.,[6] countered that national rates were appropriate considering, among other things, that the instant class draws its members from across the country and that discovery was conducted in a number of states. We think, upon reflection, that Objector Gettler states the better position. In so deciding, by no means do we intimate that counsel are anything but skilled, respected practitioners who enjoy an excellent reputation in this community. However, having studied counsel's qualifications as related in their fee application, we remain unpersuaded that, as of the date of the hearing, their practices were national in scale. We sus-

pect that, as of the date of this award, plaintiffs' counsel have taken the first broad step toward entrance in the "national" bar; henceforth, counsel indeed may be successful in persuading future courts of their national status. In light of the foregoing, though, we will award the currently charged local hourly rate for all attorneys involved.[7]

■ Even though in good conscience we cannot award counsel with national rates, their "national" quality of work will not go unrecognized or unrewarded. Without question, challenging goliath Merrill Lynch was an undertaking so massive that one would expect that only a firm of national scale would accept the challenge. It is our view that work of such high quality be compensated by award of a higher multiplier rather than by premium hourly rates.[8]

Factors five and six, the complexity of the litigation and the professional skill and standing of counsel involved on both sides, respectively, relate, of course, to the question of attorneys' fees in general. In this case in particular, however, they figure heavily in our decision concerning whether to award a multiplier, and if so, how much of one to award. We indicate, without reservation, that this case was one of the most complex, hard-fought class actions we have encountered in our six years on the Bench. The docket sheet reflects the sheer volume of pleadings filed in this case. Dif-

---

**6.** In addition to Mr. Pitcairn, experts William E. Santen and James C. Sargent testified at plaintiffs' counsel's behest in support of the petitioned-for fees. All three attorneys were highly qualified practitioners whose testimony was quite helpful to the Court. That we somewhat differ with them as to the appropriate fee in this case is not an indication that we view their opinions in this matter to be ill-considered.

**7.** It never has been the practice of this Court to parse the lodestar awarded by allowing counsel's hourly rate for year X to apply to hours logged in year X, their rates in year Y to apply to hours logged in year Y, and so on. To the extent that Objector Gettler suggests that we should employ such a practice, we observe that he has submitted no authority in support thereof; accordingly, we decline to follow that pattern.

**8.** Objector Gettler misapprehends our citation to *Blum v. Stenson* in our first Opinion and Order concerning attorneys' fees in the *Efros* case. *See Belle Efros, etc. v. William H. Dickhoner, et al.,* C-1-82-1310, doc. 88 (S.D.Ohio Dec. 31, 1985) (*Efros I*) [Available on WESTLAW, DCTU database]. As we thought we originally made clear, and as we indicated subsequently in *Belle Efros, etc. v. William H. Dickhoner, et al.,* C-1-82-1310, doc. 93 (S.D.Ohio Apr. 21, 1986) (*Efros II*) [Available on WESTLAW, DCTU database], the Court is well aware that the factors delineated in *Blum* apply only to fee awards in civil rights cases. The authority proffered in support of Mr. Gettler's argument that award of a multiplier is inappropriate is therefore inapposite and will be disregarded. And, as *Blum* makes clear, what we focus on ultimately in a common fund case is whether the percentage awarded in fees is excessive, rather than the presence and/or size of a multiplier.

ficult questions continuously were presented to the Court or the United States Magistrate for review and decision. To recite that this case alleged violations of federal securities laws and Ohio Blue Sky laws on behalf of the class, and violations of various state blue sky laws, state common law and federal Regulation T claims on behalf of the individually named plaintiffs, only generally describes this litigation. To recall the size of the class, well in excess of 200 individuals, and the possible need to prove the element of scienter as to the section 10(b) claims, begins to put counsel's undertaking a bit more in context. And to state that plaintiffs' counsel were met with opposition from well-trained, skillful lawyers necessitating judicial resolution every step of the way would not be an exaggeration.

To emphasize the challenge posed to plaintiffs' counsel by their opponents is no slight. Counsel for Merrill Lynch and Rex Railways are themselves attorneys of fine reputation and their legal acumen was most evident in their briefs, arguments, and conferences with the Court. Their skills, of course, were put to the test by the ingenuity with which plaintiffs' counsel prosecuted this lawsuit from the start. Of great influence to the Court is the fact that counsel began this suit from the ground floor up. No independent agencies were commissioned by Merrill Lynch or a watchdog organization [9] to study the boxcar problem, thus providing counsel with the heart and substance of their lawsuit. Instead, plaintiffs' counsel had to fight for much of the information they received and had to craft the theories and proof in support of their clients' position on their own. Depositions were taken across the country and tens of thousands of documents were reviewed. We previously have stated that "[i]t is creative lawyering that will earn the higher fee award from this Court, as it represents the hallmark of a gifted professional." *In re Cincinnati Gas & Electric Company Securities Litigation*, C–1–83–1721, doc. 68, slip op. at 7 (S.D.Ohio June 3, 1986) [Available on WESTLAW, DCTU database]; *see Belle Efros, etc. v. William H. Dickhoner, et al.*, C–1–82–1310, doc. 93, slip op. at 12–14 (S.D.Ohio Apr. 21, 1986) (*Efros II*) [Available on WESTLAW, DCTU database].[10] Class counsel, their associates, and the other attorneys with whom they consulted demonstrated the "creative lawyering" we had in mind when we wrote those words. To have won, through dogged persistence and clever strategy, in excess of $12,000,000 for a class of individuals whose representatives had a difficult time in even hiring a lawyer, and whose claims may well have failed on the merits, is the level of professionalism to which we encourage each member of the Bar to strive, and it merits due reward. Accordingly, having carefully thought out the matter, we believe that a percentage award of nearly twenty-five (25%) percent of the common fund created, as valued above, thus resulting in a multiplier of 2.78 or 278%, is appropriate in this case.

A few loose ends remain. Objector Gettler urges that we exclude all hours logged by counsel that were devoted to preparing their fee petition.[11] Certain authority supports his position. *See Peter Fabrics, Inc. v. S.S. "Hermes"*, 765 F.2d 306, 317 n. 5 (2d Cir.1985); *City of Detroit v. Grinnell Corporation*, 560 F.2d 1093, 1102 (2d Cir.1977); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 111 (3d Cir.1976); *Heist v. Jacob*, No. C–3–82–184, slip op. at 7 n. 6 (S.D.Ohio Apr. 17, 1985) [Available on WESTLAW, DCTU database] (Rice, J.). To our knowledge, the Sixth Circuit has not addressed this question.

■ We recently have ruled, however, that such time is and should be compensa-

---

**9.** Indeed, Attorney Helmer testified that their efforts to interest various state blue sky law investigatory teams were rebuffed.

**10.** The two cases cited grew out of the alleged mismanagement of the William H. Zimmer Nuclear Power Station. Both sets of attorneys, unlike the instant attorneys, had the discovery advantage of a number of commissioned reports. Accordingly, we gave percentage fee awards of only 15% and 11% respectively.

**11.** Upon request, plaintiffs' counsel indicated that some 268 hours were devoted to preparing the instant fee petition.

ble. *See Efros II*, doc. 93, slip op. at 7–8. We reprint our reasoning below:

Those courts that have excluded hours devoted to the fee petition have done so on the theory that the efforts expended benefit the *attorney* rather that the common fund. In fact, it is maintained that, because attorneys' fees are paid out of the fund, a fee petition operates to the detriment of the fund. *See, e.g., Lindy*, 540 F.2d at 111. The import of this notion is not lost upon the Court. Yet there is a greater concern that prompts us to conclude that fee petition hours merit compensation, one eloquently articulated by Professor Miller:

Another difference between fund-in-court and statutory fee cases is that *in the former category there is a greater need for the judge to act as a fiduciary for the beneficiaries (who are paying the fee)*, particularly in the class action situation, *because few, if any, of the action's beneficiaries actually are before the court at the time the fees are set. Judicial scrutiny is necessary inasmuch as the fee will be paid out of the fund established by the litigation, in which the defendant no longer has any interest, and the plaintiff's attorney's financial interests conflict with those of the fund beneficiaries.* As a result, there is no adversary process that can be relied upon in the setting of a reasonable fee. In statutory fee cases, however, the losing party who will pay the fee is before the court, thus obviating any need for special judicial involvement. Arguably, all the judge need do is rule on the fee application based on the competing presentations of the adversaries.

*Court Awarded Attorney Fees*, Report of the Third Circuit Task Force 21–22 (A. Miller, reporter Oct. 8, 1985) (footnote omitted) (emphasis ours). Of necessity, we must rely on plaintiffs' counsel to provide us with the requisite information so that we might make a just fee award. Often the amount of information required, especially if a case, as here, has been pending for a fair amount of time, is extensive and time-consuming to compile. Even though it is self-serving for counsel to supply that information, it also is done in the interests of justice. Thus, we think it inequitable to not compensate counsel for the time spent aiding the Court in its determination of the appropriate fee.

*Id.* Accordingly, no hours will be deducted from counsel's totals because they were devoted toward preparation and argument in support of an award of attorneys' fees.

▪▪▪ Likewise we will make no adjustment for unnecessary duplication. As our prior rulings indicate, *see, e.g., Efros II*, doc. 93, slip op. at 9–11, duplication is a topic of great concern to us, and, for that reason, we inquired of plaintiffs' counsel whether any adjustments were made prior to submission of their joint application for fees.[12] We made known our observation that we often saw more than one attorney—and sometimes several attorneys—at any given conference or hearing. In response, Attorney Helmer indicated that over 700 hours were eliminated from the submitted application. *See also* Affidavit of Timothy L. Bouscaren at ¶ 16, doc. 354; Affidavit of James B. Helmer, Jr. at ¶ 20, doc. 354. In a case in which counsel represent they have logged 10,791.75 hours, we view a prior 700–hour reduction to be reasonable and legitimate. Because such reduction allays our fears that more attorney hours than necessary are being charged against the common fund, we will make no reduction from the hours listed on the grounds of duplication.

▪▪▪ Objector Gettler has persuaded us, however, that certain other hours should be eliminated from counsel's tally.[13] Those

---

12. The Sixth Circuit has allowed courts to make across-the-board reductions of 10%. *See Kelley v. Metropolitan Board of Education*, 773 F.2d 677, 683 (6th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 853, 88 L.Ed.2d 893 (1986).

13. *See infra* note 16.

hours devoted to negotiating and effecting settlement on behalf of the named plaintiffs with Rex Railways will be excluded. The contrary argument class counsel makes, that without the settlement with Rex, Rex would not have cooperated with them, and without Rex's cooperation, the class's case either may not have proceeded to such a point that global settlement of the entire lawsuit was possible or would have required significantly more hours on class counsel's part to achieve the same result, is not without merit. Moreover, we accept counsel's statement that settlement with Rex at the particular time the parties' differences were composed strategically benefitted the class insofar as settlement kept Rex out of bankruptcy proceedings that may have stayed resolution of this entire litigation. It strikes the Court, however, that to include these hours works too great an inequity on the class members. As previously alluded to, the named plaintiffs settlement with Rex "won" them ben-efits from Merrill Lynch in addition to the benefits ordinary class members will receive. Because an award of attorneys' fees will come out of the benefit negotiated on behalf of the class, rather than that additionally secured on behalf of the named and intervening plaintiffs, to require the class to "pay" for the hours counsel devoted originally to the settlement with Rex, or for that matter, the hours devoted in 1983 and subsequently to the "named plaintiff" settlement with Merrill Lynch, would place a disproportionate burden on the class members. In fairness, we will subtract out those hours counsel devoted, on behalf of the named plaintiffs, to the early settlement with Rex Railways and the bonus received through the recent settlement with Merrill Lynch.[14]

Thus, in light of the foregoing portions of this Opinion, we hereby make the composite fee award of $3,117,128.31, which breaks down as follows:

| | Hours Expended[15] | Rate | |
|---|---|---|---|
| **Walker, Chatfield & Doan**[16] | | | **$1,473,010.80** |
| Timothy L. Bouscaren | 2319.20 × | $125/hr | $ 289,900.00 |
| John L. Campbell | 1611.70 × | 100/hr | 161,170.00 |
| Harold W. Walker | 25.50 × | 125/hr | 3,187.50 |
| Joseph Beech, III | 57.50 × | 110/hr | 6,325.00 |
| Thomas D. Anthony | 12.50 × | 100/hr | 1,250.00 |
| Winslow W. Johnson | 315.90 × | 80/hr | 25,272.00 |
| Susan J. Hovey | 95.40 × | 80/hr | 7,632.00 |
| Matthew Jay Lane | 224.00 × | 80/hr | 17,920.00 |
| Paralegals | 382.30 × | 45/hr | 17,203.50 |
| | | | $ 529,860.00 |
| | | | × 2.78 |
| | | | 1,473,010.80 |

**14.** In so ruling, we respond not only to the objection regarding same by Benjamin Gettler, but also to the concerns of class members Mary and Arthur Tatman (doc. 365).

At the hearing Objector Gettler also argued that those attorney hours logged prior to the filing of the motion requesting leave to file a consolidated class action complaint, as well as prior to certification of the class, should be scrutinized closely on the theory that they no doubt largely benefitted only the individually named plaintiffs. We disagree. The nature of class actions is such that background research and discovery needs to be conducted before plaintiffs' counsel can determine whether class action treatment is viable or appropriate. The testimony of Mr. Helmer satisfies us that at least ninety (90%) percent of the hours logged before we certified this case as a class action were devoted to class, rather than individual claims. We see no need for further reductions in counsel's lodestar hours when we already specifically excluded the attorney hours devoted solely to individual interests—that is, negotiation of settlements that work only to the benefit of the named and intervening plaintiffs because of the additional causes of action they claim they can prevail upon at trial.

**15.** See note 15 on page 707.
**16.** See note 16 on page 707.

| Law Office of James B. Helmer, Jr.[17] | | | • | $1,551,462.40 |
|---|---|---|---|---|
| James B. Helmer, Jr. | 2384.80 × | $140/hr | | $ 333,872.00 |
| Ann Lugbill | 1377.70 × | 95/hr | | 130,881.50 |
| Virginia Conlan, Whitman | 597.45 × | 95/hr | | 56,757.75 |
| Michael G. Kohn[18] | 117.25 × | 100/hr | | 11,725.00 |
| Patricia A. Kindel [19] | 331.25 × | 75/hr | | 24,843.75 |
| | | | | $ 558,080.75 |
| | | | | × 2.78 |
| | | | | $1,551,462.40 |
| **Kevin B. McCarthy** | | | | $ 61,089.11 |
| Kevin B. McCarthy[20] | 141.50 × | $140/hr | | $ 19,810.00 |
| McCarthy Paralegal | 48.10 × | 45/hr | | 2,164.50 |
| | | | | $ 21,974.50 |
| | | | | × 2.78 |
| | | | | $ 61,089.11 |
| **Beckman, Weil, Shepardson & Faller** | | | | $ 31,566.00 |
| Peter L. Cassady [21] | 240.00 × | $131.53/hr (approx.) | | 31,566.00 |

15. The "Hours Expended" includes estimated time necessary to wrap up remaining matters in this litigation. No challenge was lodged to such estimates, and we find them to be reasonable.

16. As earlier indicated, *see supra* pp. 705–06, the Court has ruled that certain hours devoted to negotiating settlements with Rex Railways initially and Merrill Lynch subsequently on behalf of the named and intervening plaintiffs should be eliminated. We accept class counsel's estimate that 285 hours were spent toward the Rex settlement and 187 hours were spent toward the special Merrill Lynch settlement. Combining both projects, those hours identified were logged by the attorneys listed below:

| | | | |
|---|---|---|---|
| Timothy L. Bouscaren | 138 hrs + 70 hrs = | 208 hrs |
| John L. Campbell | 1 hr + 49 hrs = | 50 hrs |
| Harold W. Walker | 0 hrs + 5 hrs = | 5 hrs |
| Joseph Beech, III | 0 hrs + 13 hrs = | 13 hrs |
| James B. Helmer, Jr. | 106 hrs + 36 hrs = | 142 hrs |
| Ann Lugbill | 7 hrs + 7 hrs = | 14 hrs |
| Patricia A. Kindel | 33 hrs + 7 hrs = | 40 hrs |

The column in the Court's fee award table titled "Hours Expended" excludes the hours devoted to these parochial settlements.

17. In addition to the adjustments set forth in n. 16, one additional adjustment needs to be made to the petitioned-for hours submitted by the Helmer firm. On November 7, 1985, the Helmer firm was awarded fees by the United States Magistrate in the amounts of $2,141.50 (doc. 298) and $1,820.00 (doc. 309). Nowhere in the submitted papers has Attorney Helmer indicated that the hours for which fees were awarded already were excluded from the lodestar chart. We trust that the failure to adjust the chart was a simple oversight; nonetheless, in all fairness to the class and to avoid double compensation, reductions are in order. The hours

expended as to the first award total 2.2 for Attorney Helmer, 21.45 for Attorney Whitman, and 1.05 for Attorney Lugbill. While certain of Attorney Whitman's hours and all of Attorney Lugbill's hours were omitted from the petition submitted to the Magistrate, out of an abundance of caution and to further insure that all possible duplication has been eliminated, we have subtracted all hours listed above from the chart we use to make the instant award. As to the second award, it appears that Attorney Helmer logged 13 hours. That figure, too, was deducted from the chart we use.

We also note that costs were awarded in these two instances: $197.84 and $128.33 respectively. We likewise have deducted this dollar amount from the costs awarded to the Helmer firm.

18. Because we are unaware of Attorney Kohn's current billable rate, absent any objection, we will award the petitioned-for rate, which is equal to his 1983 non-contingent hourly rate.

19. Because we are unaware of Attorney Kindel's current billable rate, absent any objection, we will award the petitioned-for rate, which is equal to her 1983 non-contingent hourly rate.

20. It appears that class counsel have asked that their colleague, Attorney McCarthy be compensated at a national rate of $200 per hour. Having familiarized ourself with Mr. McCarthy's affidavit, *see* doc. 354, we are aware of his impressive credentials. We already have explained why we believe award of national rates to class counsel and their associates to be inappropriate. *See supra* p. 703. And, despite the "national" appearance his credentials boast, we think it would be unfair to award him compensation at a higher hourly rate than that which class counsel will receive. Accordingly, we will

---

21. See note 21 on page 708.

Concerning the matter of costs, estimated or already incurred, we note that virtually no challenge has been raised to the petitioned-for amounts.[22] Therefore, we award $41,520.78 in costs to the Helmer firm and $161,764.41 in costs to the Walker firm, for a composite award of $203,285.19. Reasonable estimated costs have been included in the amount awarded to the Helmer firm. Upon receipt of this costs award, we direct that counsel refund, as promised, all expenses already advanced.

Finally, the matter of interest was brought up immediately prior to adjournment on April 2. We previously have ruled that it is permissible for class action counsel to receive a proportionate share of the interest earned on the settlement fund. *In re Cincinnati Gas & Electric*, No. C–1–83–1721, doc. 68, slip op. at 11–12 [Available on WESTLAW, DCTU database]; *Efros II*, No. C–1–82–1310, doc. 93, slip op. at 14–16. Therefore, each firm or petitioning attorney shall receive that percentage of interest accrued that represents the percentage of the $5,700,000 cash fund not yet distributed that it/he will receive by virtue of our award of attorneys' fees and costs—for example, if the attorneys' fees and costs awarded to the Walker firm is equal to X% of the $5,700,000 cash fund remaining, then counsel shall receive X% of the interest that that cash fund remaining has accrued to date. Interest is payable from April 3, 1986.

### Conclusion

In sum, plaintiffs' joint application for an award of attorneys' fees and costs is GRANTED IN PART. Counsel are awarded $3,117,128.31 in fees, and $203,285.19 in costs, to be divided as previously specified. Additionally, each firm or petitioner shall receive that portion of the interest accrued on the cash fund remaining that corresponds with the percentage that the fees and costs awarded to each firm or petitioner represents of that cash fund.

SO ORDERED.

award him the rate Attorney Helmer will receive: $140 per hour.

21. Attorney Cassady specifically requested, on behalf of his law firm, an award of $31,566, which represents compensation for 240 hours at a rate of approximately $131.53 per hour. Attorney Cassady did not request any multiplier or upward adjustment. We note that class counsel, presumably on his behalf, has made such a request.

We assume that the near–$135 per hour request represents Attorney Cassady's current billable rate, one we consider reasonable in light of the fact he has been practicing law for some twelve years. We hardly think it appropriate to award a multiplier at the behest of class counsel when Mr. Cassady never asked for one originally, nor at any subsequent time. Accordingly, he shall be awarded the lodestar amount that he has requested: $31,566.

22. But see *supra* note 17.