**James David DUBIN, on behalf of himself and all persons similarly situated, Plaintiffs,**

v.

**The E.F. HUTTON GROUP, INC., E.F. Hutton & Company, Inc., Defendants.**

**No. 88 Civ. 0876 (PKL).**

United States District Court, S.D. New York.

March 4, 1994.

Roger W. Mehle, Washington, DC by Roger M. Mehle, Kelley Drye & Warren, New York City by William R. Golden, Jr., for Dubin.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City by Anne C. Vladeck, Laura S. Schnell, for Harris.

Christopher Lovell, P.C., New York City by Christopher Lovell, Stamell, Tabacco & Schager, New York City by Joseph J. Tabacco, Jr., Jared Stamell, for Kaplan.

Willkie, Farr & Gallagher, New York City by Louis A. Craco, Mitchel H. Ochs, for defendants E.F. Hutton Group, Inc. and E.F. Hutton & Co., Inc.

## OPINION AND ORDER

ROBERTS, United States Magistrate Judge.

This is one of three related class actions arising from the acquisition of E.F. Hutton ("Hutton") by Shearson Lehman Brothers ("Shearson") in late 1987, each alleging federal securities violations and/or state law claims in connection with Hutton's Equity Ownership Plan ("EOP"). The other two actions are *Harris v. Hutton*, 88 Civ. 0172 (VLB) and *Kaplan v. Hutton*, Civil Action 88/00889 (Supreme Court, New York County). All three actions were referred to me in May 1992, for court-supervised settlement discussions, and all three cases have been settled. The settlement in *Dubin* was approved on September 15, 1993; the settlements in *Harris* and *Kaplan* were approved on December 29, 1993, and January 13, 1994, respectively. By consent of the parties and the order of Judge Leisure, this action has been assigned to me to conduct all further proceedings pertaining to the settlement of the action, including entry of final judgment.

Presently before the court are applications for attorneys fees and expenses by plaintiff James David Dubin ("Dubin") and *Dubin* counsel, and applications for fees by class counsel in *Harris* and *Kaplan*. The fee applications by *Harris* and *Kaplan* counsel arise as a result of the certification of overlapping classes in the three actions. *Harris* and *Kaplan* counsel assert that they are entitled to share in the proceeds of the *Dubin* settlement because, for over five years, they have represented over half of the *Dubin* plaintiffs (who are also plaintiffs in the *Harris* or *Kaplan* actions), and because their activities in *Harris* and *Kaplan* have conferred a benefit upon the *Dubin* class and helped create the *Dubin* settlement. These applications are opposed by Dubin and *Dubin* counsel.[1]

---

1. The court has received the following submissions that pertain to the fee applications: *Dubin:* Plaintiffs' Memorandum of Law in Support of Class Action Proposed Settlement, Counsel Fee Applications, and Expense Reimbursement, dated August 16, 1993 (*"Dubin* Memo"); Affidavit of James David Dubin in Support of Class Action Proposed Settlement and Counsel Fee Application, dated August 9, 1993 ("Dubin Aff."); Affidavit of Roger W. Mehle in Support of Class Action Proposed Settlement and Counsel Fee Application, dated August 9, 1993 ("Mehle Aff."); Affidavit of William R. Golden, Jr., in Support of Class Action Proposed Settlement and Counsel Fee Application, dated August 6, 1993 ("Golden Aff."); Plaintiffs' Memorandum of Law in Opposition to the Applications of *Harris* and *Kaplan* Counsel for Attorneys' Fees, dated August 30, 1993 (*"Dubin* Opp. Memo"); Affidavit of James David Dubin in Opposition to Fee Applications of the *Harris* and *Kaplan* Counsel, dated August 27, 1993 ("Dubin Opp.Aff."); Affidavit of Roger W. Mehle in Opposition to Fee Applications of the *Harris* and *Kaplan* Counsel, dated August 27, 1993 ("Mehle Opp.Aff.") *Harris:* Memorandum of Law in Support of Application of *Harris* Class Counsel for Attorneys' Fees, dated August 16, 1993 (*"Harris* Memo"); Affidavit of Anne C. Vladeck in Support of Application of *Harris* Class Counsel for Attorneys' Fees, dated August 16, 1993 ("Vladeck Aff."); Reply Memorandum of Law in Support of Application of *Harris* Class Counsel for Attorneys' Fees, dated September 3, 1993 (*"Harris* Reply Memo"); Reply Affidavit of Laura S. Schnell in Support of Application of *Harris* Class Counsel for Attorneys' Fees, dated September 3, 1993 ("Schnell Aff."); *Kaplan:* Memorandum of Law in Support of Petition by *Kaplan* Class Counsel for an Award of Attorneys Fees, dated August 16, 1993 (*"Kaplan* Memo"); Affidavits of Christopher Lovell ("Lovell Aff.") and Joseph J. Tabacco, Jr. ("Tabacco Aff."), dated August 16, 1993, and Jared Stamell ("Stamell Aff."), dated August 13, 1993, in Support of the Petition by *Kaplan* Class Counsel for an Award of Attorneys' Fees; Reply Memorandum of Law of *Kaplan* Class Counsel in Further Support of their Petition for an Award of Attorneys Fees, dated September 3, 1993 (*"Kaplan* Reply Memo"). The fee applications by *Harris* and *Kaplan* class counsel were also discussed at the fairness hearing held on September 8 and 9, 1993. (References to the transcript of that hearing are indicated by "Tr.").

# I

## BACKGROUND

The pending applications present difficult issues of fact, law and equity, that require an understanding of the relationship among the cases and the history of their litigation and settlement.

### The Equity Ownership Plan

Pursuant to the EOP, Hutton awarded stock ("equity shares") and stock options ("equity options") to employees as part of their compensation packages and/or as an inducement to join or stay with Hutton during a period of corporate uncertainty. Equity shares, when vested, entitled the holder to an equivalent amount of Hutton common stock without further payment. Equity options, when vested, entitled the holder to purchase an equivalent amount of Hutton common stock at a pre-established exercise price. The EOP distinguished between "awards" and "grants" of equity shares and options. Hutton "awarded" equity shares and options in lump amounts, portions of which were thereafter administratively "granted" on a fixed time schedule to the awardee—for example, 50% on the award date and 10% on each of the first through fifth anniversaries of the award date. Interests that were both "awarded" and "granted" were subject to vesting on a schedule set forth in the EOP.

### Hutton's Acquisition by Shearson

On December 2, 1987, Hutton entered into a merger agreement with Shearson. Pursuant to the merger, the purchase price of Hutton shares was $29.25 per share. The EOP provided for acceleration of vesting and payment of the cash value of equity interests upon certain events referred to in the EOP as a "Change of Control," "unless the Board of Directors determines that such event should not be deemed a change of control."

Hutton's directors determined that the Shearson merger was not a "Change of Control"; accordingly, certain Hutton employees were not paid the cash value of their equity interests under the EOP.[2] However, some employees received partial payment, or entered into a "substitution plan," in exchange for releases of their claims under the EOP.

### Commencement of Litigation

#### Harris v. Hutton

Harris was filed on January 11, 1988, and certified as a class action on November 6, 1989. The class certified in Harris consists of approximately 150 EOP participants whose awarded and granted equity shares were not vested and paid upon the merger, as allegedly required by the EOP. The Harris complaint does not seek recovery with respect to equity shares that were awarded, but not granted; nor does the complaint seek recovery with respect to equity options. The Harris plaintiffs assert claims for breach of contract, breach of fiduciary duty, promissory estoppel unjust enrichment, civil conspiracy, and tortious interference with contract.

#### Kaplan v. Hutton

Kaplan was filed in Supreme Court, New York County, on December 30, 1987, and certified as a class action on March 13, 1988. There are over 2500 class members in Kaplan, consisting of EOP participants who were awarded and granted both equity shares and equity options. The legal claims in Kaplan and Harris are for the most part the same.[3] However, the Harris class is considerably smaller and its members have comparatively larger equity share claims than the Kaplan plaintiffs, and the Kaplan class includes numerous members whose interest consists solely of equity options.[4] The Kaplan plaintiffs also assert that the "change of control" price under the EOP should be $38.50 rather than $29.25.[5] Pursuant to court order, there

---

2. Apparently some selected executives were paid as if the Hutton Board of Directors had deemed the merger a "change of control."

3. The Kaplan complaint alleges breach of contract and tortious interference with contract.

4. Some of these equity options were "under water," i.e., had an exercise price of more than the alleged "change of control" price.

5. This assertion is based upon the date alleged to be the "change of control" date.

is no duplication in membership in the *Kaplan* and *Harris* classes.

### *Dubin v. Hutton*

The *Dubin* action was commenced on February 8, 1988, as an individual action, and certified as a class action on July 19, 1990. The *Dubin* class members seek recovery for all equity shares (but not for equity options) that they were "awarded" under the EOP in connection with their hiring ("hiring awards"), including both granted and *un*granted shares. The *Dubin* plaintiffs do not seek recovery for awards made other than in connection with their hiring. The class claim in *Dubin* is based solely on § 12(1) of the Securities Act of 1933 (the "Securities Act") (sale of unregistered securities). As noted above, there is substantial overlap in class membership between the *Dubin* and *Harris* classes and between the *Dubin* and *Kaplan* classes as to awarded *and* granted equity shares.

## II

### *SUMMARY OF ACTIVITY IN HARRIS, KAPLAN, AND DUBIN PRIOR TO COURT–SUPERVISED SETTLEMENT DISCUSSIONS*

### *Harris v. Hutton*

On February 22, 1988, defendants moved to dismiss the *Harris* complaint, and in the alternative moved to stay the action pending a determination of the *Kaplan* case. This motion was denied on July 15, 1988, and plaintiffs moved on July 27, 1988 to certify the case as a class action. Defendants then moved for reconsideration of the court's decision on defendants' motion to dismiss or stay and opposed plaintiffs' motion to certify the class. On November 17, 1988, the court denied defendants' motion to reconsider its de-

cision denying defendants' motion to dismiss or stay, and on November 6, 1989, granted plaintiffs' motion for class certification.

Notice of the *Harris* action was sent to class members in January 1990. For the next sixteen months, the parties conducted discovery jointly with the parties in *Kaplan.* Plaintiffs' counsel received over 20,000 pages of documents and the parties conducted numerous depositions. Tr. 75–76. Discovery was completed in April 1991.

In February 1991, the *Harris* plaintiffs offered to settle the case for "90 cents on the dollar," *i.e.*, 90% of $29.25 per share, plus interest, plus the value of their options.[6] Letter to the court from *Harris* class counsel, dated May 26, 1992 ("*Harris* May 26, 1992 Letter") at 4. Defendants assert that this translated into a demand of $19,217,250.[7] In November 1991, defendants initiated joint settlement discussions by offering $2.19 million to settle both *Harris* and *Kaplan* (representing, according to plaintiffs' counsel, approximately $1,560,000 for *Harris* and $630,-000 for *Kaplan*).[8] Tr. 88–89; *Harris* May 26, 1992 Letter at 4; Lovell Aff. ¶ 7(a). The *Harris* class responded to the offer on November 21, 1991, with an offer of 78% of $29.25 ($22.82) per share, plus interest and options, Tr. 89, which defendants calculated as a demand of approximately $16,656,000.[9] Hutton May 22, 1992 Letter at 5. Defendants responded on December 3, 1991, with an offer of $3.5 million for both *Harris* and *Kaplan* (representing, according to plaintiffs' counsel, approximately $2,600,000 for *Harris* and $900,000 for *Kaplan* ). Tr. 89; Lovell Aff. ¶ 8(a).

In an effort to facilitate settlement, Judge Broderick suggested that the parties in *Harris* conduct a summary jury trial ("mini-

---

**6.** Although the *Harris* class definition does not include options claims, claims pertaining to options could be pursued by individual class members; accordingly, *Harris* counsel proposed settlement of both the equity share and equity option claims of the *Harris* class members. The equity option claims of *Harris* class members have been settled as part of the *Kaplan* settlement.

**7.** This calculation by Hutton does not appear to include interest and *Harris* options. Letter to the

court from Hutton counsel, dated May 22, 1992 ("Hutton May 22, 1992 Letter") at 5.

**8.** Defendants did not include *Dubin* because, in view of the overlapping shares, the settlement of *Harris* and *Kaplan* would leave *Dubin* with so few plaintiffs that defendants believed they could persuade Judge Leisure to decertify the *Dubin* class. Tr. 124–25.

**9.** *See* n. 7, *supra.*

trial"), which was held on March 5 and 6, 1992. The jury, which was not told that its verdict was non-binding, found defendants liable, awarded plaintiffs $29.25 per share and recommended to the court that compensatory and punitive damages be assessed.

On May 7, 1992, one day before *Harris* and *Kaplan* counsel were scheduled to appear before Judge Broderick for a status conference, defendants offered $12 million to settle *Harris, Kaplan* and *Dubin.* Tr. 76–80, 83.[10] This was defendants' first settlement offer addressed to all three cases.[11]

*Kaplan v. Hutton*

Plaintiffs' motion for class certification was granted on March 13, 1988, and notice to the class was sent in July 1988. Tr. 72–73. Counsel had preliminary settlement discussions between February and June 1988, which were not successful. Tr. 74–75, 92–93. Defendants filed a motion to dismiss the complaint, which was denied on October 17, 1988. The parties then engaged in discovery, which was coordinated with discovery in *Harris.* As of May 1992, when the cases were referred to me for supervision of settlement discussions, a small amount of discovery remained to be completed. As noted above, settlement discussions pertaining to both *Kaplan* and *Harris* began in late 1991, resulting in offers from the defendants of (1) $2.13 million to settle *Harris* and *Kaplan;* (2) $3.5 million to settle *Harris* and *Kaplan;* and (3) $12 million to settle *Harris, Kaplan* and *Dubin.*

*Dubin v. Hutton*

The original *Dubin* complaint (brought by Dubin individually) [12] included the following claims: (a) Hutton's offer and sale of unregistered securities to Dubin in violation of § 12(1) of the Securities Act, (b) securities fraud in violation of § 12(2) of the Securities Act, §§ 10(b), 15(c)(1), and 17(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and (c) common law fraudulent representation and breach of contract.

Hutton moved to dismiss the complaint on May 20, 1988. On September 7, 1988, Judge Leisure dismissed Dubin's claims under § 15(c)(1) and § 17(a) of the Exchange Act, but upheld Dubin's other claims. *Dubin v. The E.F. Hutton Group, Inc.,* 695 F.Supp. 138, 147–149 (S.D.N.Y.1988).

Dubin was potentially a member of both the *Harris* and *Kaplan* classes. In July 1988, Dubin's counsel, Roger Mehle ("Mehle"), reviewed information received by Dubin regarding *Kaplan,* and eventually advised Dubin to opt out of that class, which he did on August 1, 1988. Tr. 95–97.

On September 19, 1988, the *Dubin* complaint was amended to state Count I, the claim under § 12(1) of the Securities Act (sale of unregistered securities), as a class claim. The parties commenced discovery, which was not coordinated with *Harris* or *Kaplan,* and conducted motion practice. Tr. 100–103. Mehle received numerous documents and conducted two depositions. Tr. 102. The complaint was amended a second time, on October 3, 1989, with respect to the class definition and estimated class size (the "Second Amended Complaint"). Tr. 103.

Mehle then began discovery designed to "identify by name those people who had been hired by Hutton in return for shares." Tr. 103. Defendants deposed Dubin in January 1990. Tr. 104. Also in January 1990, Dubin received notice of the certification of the

---

10. Defendants decided in May 1992 that they wanted to "buy peace" in all three cases. Tr. 81–82. They therefore offered to settle the three actions as a group, and suggested to Judge Broderick that all three cases be consolidated for settlement discussions. Tr. 82. Defendants also sought permission to file a summary judgment motion and a motion to decertify the class in *Harris,* but Judge Broderick urged defendants to refrain from filing motions and to focus their efforts on consolidated settlement discussions. Tr. 83–84. These motions were eventually filed in January 1993, and later withdrawn as a result of the settlement.

11. This offer was not allocated by defendants among the cases.

12. Although Mehle was aware of the *Harris* and *Kaplan* actions, he decided to file a separate action on behalf of Dubin because it was his understanding that *Kaplan* covered only options, and that *Harris* covered only "granted" shares. Dubin had been awarded 10,000 shares in connection with his hiring, only 5,000 of which had been granted. Tr. 93–94.

class in *Harris,* and, after consultation with Mehle, concluded that there was no reason that he could not remain a member of the *Harris* class while pursuing class certification in Dubin. Tr. 105–06.

In March 1990, Dubin filed a motion for class certification, in connection with which Mehle reviewed the *Harris* and *Kaplan* actions, in order to advise Judge Leisure of their scope and status. Tr. 105–07.

On July 19, 1990, Judge Leisure certified the *Dubin* class, noting that neither *Harris* nor *Kaplan* included claims under the federal securities laws. *Dubin v. The E.F. Hutton Group, Inc.,* [1990 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 95,362, 1990 WL 105757 (S.D.N.Y. July 20, 1990). At the expiration of the opt-out period in February 1991, 45 persons had been identified who met or possibly met the class definition.

Mehle first met class counsel for *Harris* (Anne Vladeck ["Vladeck"]) and *Kaplan* (Christopher Lovell ["Lovell"]) in March 1991, at a meeting in New York arranged by Lovell, "simply to get acquainted and to more or less compare notes in a general fashion on our respective litigations * * *." Tr. 99 (Mehle); *see also* Tr. 132 (Vladeck).[13] Mehle agreed with a proposal by Lovell to seek Hutton's permission to share discovery (some of which was subject to confidentiality orders), but Hutton refused. Tr. 100. Accordingly, *Dubin* counsel never shared in the discovery obtained by *Harris* and *Kaplan* counsel.

Beginning in February 1991, the parties in *Dubin* discussed and litigated defendants' request to obtain discovery from individual class members; following briefing, that request was denied by Judge Leisure in January 1992. Tr. 109–110. Mehle then sought permission to file a motion for summary judgment, which was denied in early April 1992, at which time Judge Leisure set the case for trial on or about August 3, 1992, with respect to all of Dubin's claims, includ-

ing Count I, the class claim. Tr. 109–11. Further discovery and proceedings regarding the class claims were stayed pending determination of Hutton's liability to Dubin on Count I. Tr. 110, 112–13. Based upon the imminent trial date, Mehle believed it was necessary to retain additional trial counsel, and contacted the firm of Kelley, Drye & Warren ("KDW"), which was eventually approved as co-counsel on August 24, 1992.[14] At about the same time, Mehle learned about the mini-trial in *Harris,* and spoke briefly with Vladeck. Tr. 113–14.

On May 7, 1992, defense counsel advised Mehle that they had communicated to *Harris* and *Kaplan* counsel an offer of $12 million to settle all three actions. Tr. 114–15. Until that point, there had been "no meaningful settlement discussions" in *Dubin.* Tr. 117; Letter to the court from *Dubin* counsel, Roger W. Mehle, dated May 26, 1992 at 7.[15]

## III

### COURT–SUPERVISED SETTLEMENT DISCUSSIONS

#### *Joint Settlement Discussions*

In May 1992, the *Harris, Kaplan* and *Dubin* actions were referred to me to assist the parties in settlement—ideally, in view of the overlapping claims and class members, a "global" settlement of all three actions. Counsel in all three cases first appeared before me on May 28, 1992. In these joint discussions, a number of settlement issues were identified. First, the parties were in substantial disagreement on certain facts, *e.g.,* the number of shares at issue, the extent to which class members had already been compensated for their shares, the number of shares held by plaintiffs who were members of both the *Dubin* class and the *Harris* or *Kaplan* class ("overlapping shares"), which class members had signed releases, and the number and exercise price of options. Second, the parties were also in substantial dis-

---

**13.** Dubin himself obtained documents and discussed the case with *Harris* counsel on a number of occasions. Tr. 132.

**14.** KDW, with William R. Golden, Jr. ("Golden") as one of the lead attorneys, began working on

the *Dubin* case on April 26, 1992. *See* Golden Aff., Ex. A (time records).

**15.** Early in the case, at defendants' invitation, Mehle had made a settlement demand, but defendants found it too high to pursue. Tr. 83, 117.

agreement regarding the validity of the releases, whether a determination of the validity of the releases was necessary prior to agreement on a settlement amount, and the value of the options. Third, *Harris* and *Kaplan* counsel insisted that defendants guarantee a specified recovery "per share;" defendants, however, wished to offer a "pot" to be divided up by class counsel. Fourth, all counsel agreed that the existence of overlapping shares raised certain "equity" issues, and that 1) plaintiffs who were similarly situated, although members of different classes, should receive at least roughly equivalent per share net recoveries; 2) defendants should not "pay twice" for the overlapping shares; and 3) of particular significance in connection with the pending fee applications, all counsel, including Mehle, acknowledged that an allocation of counsel fees would be necessary with respect to the overlapping plaintiffs and shares.

Counsel in all three cases began working together to address these issues. However, within weeks of the first joint settlement meeting, it became clear that a "global" settlement could not quickly be achieved. Although the *Dubin* trial had been adjourned to September 29, 1992, to accommodate discovery of expert witnesses, the existence of a trial date made settlement of that case more pressing. Even more importantly, however, the relatively small size of the *Dubin* class and the relatively small number of shares at issue facilitated resolution of disputes regarding the numbers of shares awarded, numbers of shares compensated and shares as to which releases had been executed. In addition, *Dubin* counsel was somewhat more flexible than *Harris* and *Kaplan* counsel regarding the concept of settling on terms that would provide a smaller recovery to those class members who had signed releases, and I was hopeful that a framework or procedure for addressing the issue of releases could be worked out in *Dubin* that could be applied in *Harris* and *Kaplan.* Accordingly, at my urging, *Dubin* counsel and, reluctantly, counsel for defendants [16] entered into separate settlement negotiations.[17]

### Separate Settlement Discussions in Dubin

Over a period of several weeks, Mehle and defendants' counsel exchanged information and arrived at an agreement on the number of uncompensated shares at issue in *Dubin,* including "overlapping shares" with *Harris* and *Kaplan.*[18]

Although settlement discussions progressed, the parties continued to prepare for trial, and on September 14, 1992, the parties filed all requisite pretrial documents. On September 17, 1992, because of scheduling conflicts, the court postponed the September 29 trial date indefinitely, but placed the case on the ready-for-trial calendar subject to call on 48 hours' notice.

Finally, on December 29, 1992, the parties entered into a Memorandum of Understanding providing for a settlement of the action in principle, and on June 15, 1993, executed a Settlement Agreement settling the class claim and a Settlement Agreement settling Dubin's four individual claims.

### The Dubin Settlement
#### Dubin's Individual Claims

Four of the five counts in the Second Amended Complaint (Counts II through V) were asserted solely on behalf of Dubin as an individual. These individual claims have been settled for $21,325.50.

#### The Class Settlement

The *Dubin* class claims (Count I of the Second Amended Complaint) have been settled for $4,128,674.50. Settlement Agree-

---

**16.** *See* Tr. 63–64.

**17.** *See* Tr. 64–65.

**18.** This process resulted in a significant reduction of the size of the *Dubin* class and recovery originally projected by Mehle. At the outset of court-supervised settlement discussion, Mehle believed that there were as many as 45 *Dubin* class members, holding approximately 276,000 uncompensated shares. Eventually, the parties in *Dubin* agreed that the class consisted of 33 plaintiffs, holding 167,153 uncompensated shares. Stipulation and Agreement of Settlement ("Settlement Agreement"), Ex. E at 4. Moreover, a significant number of the remaining shares were subject to a release defense and therefore less valuable for purposes of settlement. *Id.*

ment at 10; Order and Final Judgment Approving Settlement, dated September 15, 1993. The settlement contemplates a class of 33 individuals, holding a total of 167,153 uncompensated equity shares. Settlement Agreement, Ex. E at 4. However, because a number of the class members signed releases, and because the claims of some class members are subject to other defenses, the settlement contains an allocation plan that assigns to each prospective class member a certain number of "adjusted" shares to be compensated on a pro rata basis from the settlement fund after deductions for attorneys' fees and expenses. *Id.;* Tr. 10–11. There are a total of 120,585 "adjusted" shares. Settlement Agreement, Ex. E at 4. The amount received by a class member pursuant to the allocation plan is referred to as his or her "net recovery."

The Settlement Agreement and Notice of Class Action Proposed Settlement, Settlement Hearing, and Right to Appear advised the class that counsel intended to apply to the court for an award of fees not to exceed $1,400,000, plus reimbursement of Dubin's expenses not to exceed $90,000, and that court-approved expenses of administering the settlement would be paid from the Settlement Fund.[19] Settlement Agreement ¶ 8 and Exhibit C (Notice) ¶ 9. Assuming approval of the requested fees and expenses, Mehle projected a net recovery of $22.50 per adjusted share. Tr. 162. I approved the settlement on September 15, 1993, reserving decision on the fee applications; on November 8, 1993, I approved distributions to the class members from that portion of the settlement fund not subject to claims for fees and expenses.

### The Settlement of Harris and Kaplan

Coordinated settlement discussions in *Harris* and *Kaplan* progressed independently of *Dubin.* Indeed, *Dubin* counsel refused, and successfully persuaded defendants to refuse to discuss developments in the *Dubin* settlement discussions with *Harris* or *Kaplan* counsel. *See* Schnell Aff. ¶ 3. *Harris* and *Kaplan* counsel eventually learned that the *Dubin* settlement would include all of the overlapping shares, and require the *Dubin* class plaintiffs to release all rights to a recovery for those shares. *Harris* and *Kaplan* counsel assumed, as did I, that Mehle would eventually contact them to attempt to work out a satisfactory fee allocation. Unfortunately, Mehle never met those expectations.[20]

In *Harris,* the parties signed a Memorandum of Understanding in July 1993, pursuant to which defendants placed $16,500,000 in an interest-bearing escrow account and entered into a Stipulation of Settlement and Settlement Agreement in October 1993. In *Kaplan,* the parties signed a Memorandum of Understanding in August 1993, pursuant to which defendants placed $8,072,000 in an interest-bearing escrow account, and entered into a Stipulation of Settlement and Settlement Agreement in November 1993. The *Kaplan* settlement covered the equity shares and options held by the *Kaplan* plaintiffs and also the equity options held by the *Harris* plaintiffs.[21] The *Harris* settlement was approved by me on December 29, 1993, at which time I also awarded attorneys fees totalling $2,600,000 (15.75% of the settlement). The *Kaplan* settlement was approved by Justice Shackman in January 1994. *Kaplan* counsel had planned to apply for $1,950,000 in attorney's fees (24% of the

---

**19.** I have to date awarded $7,300 in fees to Mehle and $14,502 for expenses incurred in the administration of the settlement. *See* pp. 28–29, *infra.*

**20.** *Dubin* counsel suggests that his acknowledgment of the need to allocate fees for overlapping shares was only operative in the context of a joint settlement. *Dubin* Opp. Memo at 10 n. 5. Based upon my notes and recollection of the settlement discussions, this is self-serving revisionist history. *Dubin* counsel's current position that the application by *Harris* and *Kaplan* counsel is "baseless" (*Dubin* Opp. Memo at 28), and demonstrates "astonishing chutzpah" (*see*

Schnell Aff., Ex. A), derives, in my view, from the fact that as a result of the exchange of information between *Dubin* counsel and defense counsel that occurred during the separate *Dubin* settlement discussions, the size of the *Dubin* class and potential recovery was substantially reduced. *See* n. 18, *supra.* This diminishment of the projected *Dubin* class left no room for an allocation to *Harris* and *Kaplan* counsel without unacceptably compromising *Dubin* counsel's own fee expectations.

**21.** *See* n. 6, *supra.*

settlement); however, since their application for fees in this action was still pending, *Kaplan* counsel deducted the $85,000 sought in this action from their application in *Kaplan,* and were awarded fees of $1,865,000. *See* Letter to the court from Christopher Lovell, dated January 18, 1994.

## IV

### *THE FEE APPLICATION BY DUBIN COUNSEL*

#### *Applicable Law*

■ *Dubin* counsel, as well as *Harris* and *Kaplan* counsel seek an award of fees and expenses pursuant to the "common fund" or "equitable fund" exception to the "American Rule" rule that the prevailing party is not entitled to collect attorney's fees from the loser. Under this doctrine, "an attorney whose actions have conferred a benefit upon a given group or class of litigants may file a claim for reasonable compensation for his [or her] efforts." *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1098 (2d Cir.1977) ("*Grinnell II* "). The underlying principle of the equitable fund doctrine is that the members of a group or class should pay reasonable compensation to the attorneys representing their interests. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 469 (2d Cir. 1974) ("*Grinnell I* "). Accordingly, the court, relying on its equitable powers, may apportion fees among those who have benefitted from the creation, preservation or protection of a settlement fund by charging the fees against that fund. *In re McDonnell Douglas Equipment Leasing Sec. Litig.* ("*McDonnell Douglas I* "), 838 F.Supp. 729, 741 (S.D.N.Y. 1993); *Trief (Jack) v. The Dun & Bradstreet Corp.,* 840 F.Supp. 277 (S.D.N.Y.1993).

■ When a fund is created through the settlement of a class action, the court, as guardian of the rights of the class members, is not bound by the amount of the fee award requested by counsel even where notice of the fee request has been provided to all class members and no objections have been received. *Trief,* 840 F.Supp. at 282; *McDonnell Douglas I,* 838 F.Supp. at 741.

#### *Lodestar Method*

The Second Circuit has held that "[t]he starting point of every fee award * * * must be a calculation of the attorney's services in terms of the time he [or she] has expended on the case." *Grinnell I,* 495 F.2d at 470. In *Grinnell I,* the Second Circuit established what has become known as the "lodestar" method, in which the court computes a lodestar number by multiplying the number of hours reasonably expended by a reasonable hourly rate. *Grinnell I,* 495 F.2d at 470–71; *see also In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 226, 232 (2d Cir.1987); *Grinnell II,* 560 F.2d at 1098–99. The Second Circuit adopted the lodestar method in equitable fund cases in response to criticism of the contingent fee approach, in order to avoid the award of "windfall fees" that were "out of proportion to any services performed by counsel." *Grinnell I,* 495 F.2d at 468–70; *see also In re McDonnell Douglas Equip. Leasing Sec. Litig.* ("*McDonnell Douglas II* "), 842 F.Supp. 733, 740 (S.D.N.Y.1994).

Under the method adopted in *Grinnell I* and *Grinnell II,* once the court has calculated the lodestar, it may adjust the lodestar up or down by applying a multiplier based on certain "less objective factors," such as the: 1) risk of success/loss (sometimes referred to as the "contingent fee risk"); 2) quality of counsel's work; and 3) complexity of the issues. *See Agent Orange,* 818 F.2d at 232; *Grinnell I,* 495 F.2d at 471; *Grinnell II,* 560 F.2d at 1098; *McDonnell Douglas II,* 842 F.Supp. at 740.[22] Risk of success/loss is "'perhaps the foremost' factor to be consid-

---

22. Courts have applied a wide range of multipliers, including none at all. *See, e.g., Agent Orange,* 818 F.2d at 234–37 (affirming award of quality multipliers of 1.5 and 1.75, and denial of risk multiplier); *In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.,* 724 F.Supp. 160, 164–65 (S.D.N.Y.1989) (lodestar multiplier of 2.3 for the steering committee and multiplier of 1.5 for other counsel); *McDonnell Douglas II,* 842 F.Supp. at 744–46 (applying 1.44 risk-enhancement factor); *Trief,* 840 F.Supp. at 282–85 (rejecting request for 2.74 multiplier, finding that no enhancement of lodestar necessary to calculation of reasonable fee award); *Kronfeld v. Transworld Airlines, Inc.,* 129 F.R.D. 598, 609–10 (S.D.N.Y.1990) (applying "risk of loss" multiplier of 1.25).

ered under the second prong of the lodestar analysis." *Agent Orange,* 818 F.2d at 236 (quoting *Grinnell I,* 495 F.2d at 471); *see also In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.,* 724 F.Supp. 160, 164 (S.D.N.Y.1989) (if a multiplier is used, the "risk of litigation" or "contingent fee risk" is perhaps "the only remaining valid basis now recognized by the caselaw of multipliers.").

■ In *City of Burlington v. Dague,* ——— U.S. ———, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), the Supreme Court held that enhancement for contingency is not permitted in statutory fee-shifting cases. *Id.* at ——— ———, 112 S.Ct. at 2643–44. *Burlington* culminated a series of Supreme Court decisions restricting post-lodestar multipliers or fee enhancements in statutory fee shifting cases. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air ("Delaware Valley II"),* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, ("Delaware Valley I"),* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Neither the Supreme Court nor the Second Circuit has addressed the question of whether this prohibition applies equally to equitable fund cases.[23] In *Agent Orange,* the Second Circuit acknowledged the restrictions imposed in *Blum* and *Delaware Valley I,* but affirmed a quality multiplier, observing that "equitable fund cases may afford courts more leeway in enhancing the lodestar, given the absence of any legislative directive." *Agent Orange,* 818

F.2d at 234 n. 2. Moreover, although the court affirmed the denial of a risk multiplier, it gave no indication that a fee enhancement would be prohibited by the decisions in *Blum* and *Delaware Valley I.* Rather, the court reaffirmed the need for a multiplier in cases where the necessary incentive for prosecution " 'would be lacking and a major weapon for enforcing various public policies would be blunted'." *Id.* at 236 (quoting *Grinnell I,* 495 F.2d at 471). Observing that risk multipliers pose the problem of "reward[ing] counsel for bringing cases of dubious merit," the court held that "in adjudging whether to award a risk multiplier, [a court] should examine closely the nature of the action in order to determine whether, as a matter of public policy, it is the type of case worthy of judicial encouragement." *Id.* at 236. In light of this holding, and in the absence of a definitive statement to the contrary since *Burlington,*[24] I find that in this circuit, *Burlington* does not prohibit post-lodestar fee enhancements in equitable fund cases, provided that they are subjected to close examination to avoid the problems identified by the court in *Agent Orange.*

### Percentage–of–Recovery Method

I note that although the Second Circuit has repeatedly adhered to the principles of *Grinnell* in equitable fund cases, a trend has developed among district courts in the Southern District of New York to award attorney's fees as a percentage of recovery, rather than pursuant to the lodestar method. *See, e.g., Bragger v. Trinity Capital Enter. Corp.,* 92 Civ. 2124 (LMM), 1993 WL 287626 *4

**23.** The lower courts are split on this issue. *See, e.g., McDonnell Douglas II,* 842 F.Supp. at 740–42 (*Burlington* admonition against post-lodestar adjustments for risk not applicable to award of attorney's fees payable from settlement fund); *In re Bolar Pharmaceutical Co., Inc., Sec. Litig,* 800 F.Supp. 1091, 1095–96 (E.D.N.Y.1992) (*Burlington* ban on fee enhancement for contingency in statutory fee-shifting cases extends to equitable fund cases).

**24.** *Grant v. Martinez,* 973 F.2d 96 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993), is the only Second Circuit fee award case decided since the *Burlington* decision. In that case, the court stated: "The determination of the amount of the award does not end with the lodestar calculation. Although

there is a strong presumption that the lodestar figure represents the reasonable fee, [citing *Burlington*], other considerations may lead to an upward or downward departure from the lodestar. The party advocating such a departure, however, bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee." *Id.* at 101 (other citations and internal quotations omitted). *Grant,* however, concerned a § 1988 fee application, and the question of whether the lodestar should have been adjusted downward for limited success. *Id.* at 101. *Grant* therefore provides little if any guidance on the applicability of *Burlington* to a request for a fee enhancement in an equitable fund case.

(S.D.N.Y. July 23, 1993); *Chatelain v. Prudential–Bache Sec., Inc.*, 805 F.Supp. 209, 215 (S.D.N.Y.1992) ("This Court declines to apply the lodestar method, and instead favors the use of the straight percentage of recovery method."); *In re RJR Nabisco, Inc. Sec. Litig.*, 88 Civ. 7905 (MBM), 1992 WL 210138 *6 (S.D.N.Y. Aug. 24, 1992) (awarding percentage fee rather than a lodestar amount).

The judges who have adopted the percentage-of-recovery method contend that the lodestar method "wastes court time in determining the multiplier, lacks predictability, and provides little incentive to arrive at an early settlement." *Chatelain*, 805 F.Supp. at 215 (*citing Union Carbide*, 724 F.Supp. at 166). Moreover, the "apparent precision" of the lodestar approach has been criticized for "convey[ing] a false sense of accuracy and fairness." *In re Gulf Oil/Cities Service Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y.1992). Other courts have adhered to the lodestar method. *See e.g., Trief*, 840 F.Supp. 277, 282 (applying lodestar approach over counsel's request for percentage-of-recovery); *McDonnell Douglas I*, 838 F.Supp. 729, 741–42 ("loadstar method is the proper approach for computing the assessment of attorney's fees against an equitable fund"); *Kronfeld*, 129 F.R.D. at 601 (applying lodestar analysis, but relying on percentage-of-recovery calculation "to demonstrate that the fee award is reasonable given the size of the * * * settlement fund").

Under the percentage-of-recovery method, district courts in this circuit have awarded fees ranging from 15% to 50% of a settlement fund, *Chatelain*, 805 F.Supp. at 215, although the preferred figure seems to be around 30 percent. *In re Gulf Oil*, 142 F.R.D. at 597 (awarding 30%); *RJR Nabisco*, 1992 WL 210138 *6–7 (awarding 25%); *Chatelain*, 805 F.Supp. at 215 (awarding 28%). In determining an appropriate percentage of a settlement fund, courts look at such factors as: 1) whether there was a "free ride" on the efforts of a governmental agency; and 2) the skill and resourcefulness of counsel. *See In re Gulf Oil*, 142 F.R.D. at 597; *In re RJR Nabisco*, 1992 WL 210138 *6.

Under either the lodestar or percentage of recovery method, the court must consider the following factors in determining an appropriate fee: 1) time and energy expended by counsel; 2) complexity of the litigation; 3) risk of the litigation; 4) quality of representation; 5) the relationship between the fee request and the size of the overall settlement; and 6) public policy considerations. *Grinnell I*, 495 F.2d at 470; *In re First Investors Corp. Sec. Litig.*, 1993 WL 535009 *6 (S.D.N.Y. Dec. 22, 1993); *Chatelain*, 805 F.Supp. at 215–16; *In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 746–47 (S.D.N.Y.1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986).

### Fee Award for Work on Dubin's Individual Claims

It is undisputed that an attorney may recover fees for work performed on a plaintiffs' individual claims, including work performed prior to class certification, if that work benefitted the class. *See, e.g., Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 640 F.Supp. 697, 706 n. 14 (S.D.Ohio 1986). In *Basile*, the court found that at least ninety percent of the hours logged by counsel prior to class certification were devoted to class, rather than individual claims, observing that "[t]he nature of class actions is such that background research and discovery needs to be conducted before plaintiffs' counsel can determine whether class action treatment is viable or appropriate." *Basile*, at 706 n. 16.

At the same time, however, attorney hours devoted to work on claims asserted solely by an individual plaintiff must be excluded. *See id.* As the court observed in *Basile*, "[b]ecause an award of attorneys' fees will come out of the benefit negotiated on behalf of the class, rather than that additionally secured on behalf of the named * * * plaintiffs, to require the class to 'pay' for the hours counsel devoted [to settlement of the individual claims of the named plaintiffs] would place a disproportionate burden on the class members." *Id.* at 706. *See also Longden v. Sunderman*, 979 F.2d 1095, 1101 (5th Cir. 1992) (services rendered for individual claims of named plaintiffs could not be compensated from funds belonging to the class); *Parker v.*

*Anderson,* 667 F.2d 1204, 1214 (5th Cir.1982) (same), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982). Furthermore, the burden is on class counsel to identify in the fee application how much time has been spent on individual as opposed to class claims. *Parker,* 667 F.2d at 1214 (finding fee request "not properly documented" and "inadequate," because it failed to show which fees were for services that benefitted the class and which pertained to the individual claims of the named plaintiffs).

## Discussion

With the above principles in mind, I turn to the applications for fees and expenses submitted by Dubin, and *Dubin* counsel, which, in accordance with Second Circuit precedent, I evaluate under the lodestar method.

Dubin and the *Dubin* class were represented by Mehle alone for over four years (December 17, 1987 to April 25, 1992), and by him together with KDW as co-counsel for nearly one and a half more years to the date of the fairness hearing (April 26, 1992 to September 8, 1993).

Attached to the Mehle Affidavit as Exhibit A are monthly invoices submitted to Dubin setting forth Mehle's activities on an hourly basis through June 15, 1993, the date of execution of the Settlement Agreement. They total 2,613.1 hours. Their dollar total, calculated at the same hourly rate ($250) charged by Mehle to all his clients during the applicable period, is $653,275. Mehle also asks this court to apply to the Court for a multiplier of 1.5 times this amount, *i.e.,* a total fee of $979,912.50 (Mehle's loadstar plus $326,637.50); alternatively, Mehle seeks the same amount awarded as approximately 23.4% of the Settlement Fund as of June 15, 1993.[25]

Similarly, attached to the Golden Affidavit as Exhibit A are KDW's invoices setting forth KDW's activities on an hourly basis through June 15, 1993. Their hourly total is 1,306.6 hours. Their dollar total, which Golden represents is calculated at the same hourly rates routinely charged by the respective personnel to KDW's clients during the applicable period, is $267,336.70. KDW also seeks a multiplier of 1.5 times this amount, *i.e.,* a total fee of $401,005.05 (KDW's loadstar plus $133,668.35); alternatively, KDW seeks the same amount awarded as approximately 9.6% of the Settlement Fund as of June 15, 1993.[26]

The total fees sought by Mehle and KDW for work performed through June 15, 1993, is $1,380,917.50 (including a $460,305.85 multiplier). This amount represents 33.45% of the class settlement ($4,128,674.50). In addition, Dubin and *Dubin* counsel have received payment for fees and expenses incurred in administering the settlement that include counsel fees to Mehle of $7,300. *See* Letters to the court from Roger W. Mehle, dated July 1 and August 4, 1993, and Orders Approving Payment from Settlement Fund dated July 8 and August 9, 1993. Further, by letter to the court dated October 20, 1993, Dubin and *Dubin* counsel seek further payments for fees and expenses incurred in administration of the settlement, including $21,575 in counsel fees to Mehle and $27,147.50 in counsel fees to KDW.

All expenses of the litigation from December 1987 through June 15, 1993, were paid by Dubin. These expenses include, *inter alia,* the out-of-pocket expenses of Mehle and KDW, the fees of an expert witness, the cost of the class action pendency notice newspaper advertisement, and Dubin's own out-of-pocket expenses. The invoices and other supporting documents containing the expenses that Dubin has paid to maintain this action since December 1987 are attached to the Dubin Affidavit as Exhibit A. Their dollar total is $88,088.41.

---

**25.** As defined in the Settlement Agreement, the "Settlement Fund" is the amount deposited by defendants on December 29, 1992, into an interest bearing escrow account, with interest accruing for the benefit of the plaintiffs. Settlement Agreement ¶ 1(d). Based upon the computation of the percentage of the Settlement Fund represented by the fee applications of Mehle and KDW, the Settlement Fund was apparently in excess of $4,175,000 as of June 15, 1993, *i.e.,* $979,912.50 (sought by Mehle) is 23.4% of $4,187,660.20; $401,005.05 (sought by KDW) is 9.6% of $4,177,135.90.

**26.** See n. 12, *supra.*

In addition, Dubin and *Dubin* counsel have received payment for expenses of $14,502 incurred in administering the settlement. *See* letters to the court from Roger W. Mehle, dated July 1 and August 4, 1993, and Orders Approving Payment from Settlement Fund dated July 8 and August 9, 1993. By letter to the court dated October 20, 1993, Dubin and *Dubin* counsel seek further payments for expenses incurred in administration of the settlement totalling $5,192.79.

*Fees and Expenses Attributable Solely to Dubin's Individual Claims*

■ All of the fees and expenses incurred in connection with this action have been charged to the class, *i.e.*, none of Mehle's or KDW's fees and none of the expenses incurred by counsel or by Dubin have been allocated to Dubin's individual claims—even though four of the five counts of the complaint are asserted solely on behalf of Dubin. *See* Tr. 191–192. Remarkably, this issue is not addressed in any of the submissions in support of the fee and expense applications by Mehle, KDW, and Dubin. When questioned at the fairness hearing regarding the absence of an allocation or adjustment for work performed on Dubin's individual claims, Mehle responded that it has been "recognized in this Circuit and others" that "work thus done for a named plaintiff if it is helpful ultimately to the class claim, may be recompensed along with the work that is done exclusively for the class or specifically for the class * * *." Tr. 192. Mehle further asserted that "the intertwining of the individual claims with the class claims is such that it probably wasn't even possible to be able to say as to which five minutes out of a particular hour we were discussing his individual claims." Tr. 191–92.

I disagree. Indeed, having reviewed counsel's time records, and the submissions to Judge Leisure, I find the failure to allocate any fees and expenses to Dubin's individual claims to be professionally irresponsible and clearly contrary to the interests of the class members other than Dubin.

As noted above, this suit was initially brought by Dubin, solely on his own behalf, asserting federal securities claims and state law claims for common law fraudulent representation and breach of contract. It was not until September 19, 1988, that the complaint was amended as a proposed class action, and then only with respect to the claim under § 12(1) of the Securities Act (sale of unregistered securities). The class was not certified until July 1990.

Several instances stand out in the time records and submissions to Judge Leisure as examples of segregable activity benefitting only Dubin.

At the outset of the case Mehle devoted approximately 40 hours ($10,000) to the pursuit of a default judgment against defendants, which clearly benefitted only Dubin. (Plaintiff and defendants eventually stipulated to extend defendants' time to answer or move.)

Hutton then moved to dismiss the complaint on May 20, 1988, a motion which was addressed to Dubin's individual claims, as well as the § 12(1) claim. Mehle spent at least 165 hours ($41,250) in connection with this motion, based upon Mehle's opposition papers, a significant portion of this time was devoted to claims asserted solely by Dubin. This effort did not benefit the class eventually certified.

Moreover, separate and apart from the defense of the motion to dismiss, Mehle had to devote some time to pre-complaint research on the individual claims, as well as to post-complaint discovery and research. I note, for example, that fifteen of the thirty pages of Plaintiff's Proposed Conclusions of Law, and twenty of the thirty pages of Plaintiff's Trial Memorandum of Law, pertain to Dubin's individual claims. Mehle spent at least 140 hours ($35,000) on these pretrial submissions; KDW spent 100 hours (approximately $30,000 at Golden's hourly rate) in September 1992 alone.[27] It is simply undeniable that Mehle and KDW devoted a significant amount of time to legal work that pertained solely to Dubin's individual claims (in-

---

**27.** In addition to the time spent on these specific pretrial submissions, KDW attorneys undoubtedly devoted at least a modest amount of time to familiarizing themselves with the factual and legal bases for Dubin's individual claims, and preparing those claims for trial.

cluding the settlement of those claims), the cost of which they now seek to impose on class members who derived no benefit from that work. This issue was clearly foreseeable and required a special effort by counsel to maintain detailed records reflecting as closely as possible the work devoted exclusively or substantially to Dubin's individual claims. To be sure, some of counsel's activities with respect to the individual claims were so "intertwined" with the class claims that they may fairly be charged to the class. Here, however—as set forth by example above—a significant amount of the legal work related solely to Dubin's individual claims, and counsel have made no effort whatsoever to adjust their fee application accordingly.

Based upon my review of the fee applications, the submissions to Judge Leisure and all prior proceedings in this action, I find the at least 15% of Mehle's pre-class complaint fees and 5% of his post-class complaint fees are attributable to Dubin's individual claims.[28]

*Pre–Settlement Expenses Incurred by Dubin*

As noted above, Dubin seeks reimbursement of pre-settlement expenses (through June 15, 1993) in the amount of $88,088.41. Once again, there has been no allocation of expenses to Dubin's individual claims. Dubin paid $751.50 in pre-class complaint expenses ($426 of which were incurred specifically in connection with the motion for a default judgment that was ultimately withdrawn). Dubin paid $87,336.91 in post-class complaint expenses. I find that $526 of the pre-class complaint expenses (the $100 filing fee and default judgment motion expenses) are attributable to Dubin's individual claims. All of the post-class complaint expenses, however, are properly reimbursable from the settlement fund because they would have been incurred on behalf of the class regardless of the existence of Dubin's individual claims.

*Mehle/KDW Fee Applications*

Mehle seeks fees totalling $91,125 for work performed prior to the filing of the class

complaint and fees totalling $562,150 for work performed after the filing of the class complaint through the settlement (August 1988 through June 15, 1993).

For the pre-class complaint period, I must subtract $13,668.75 attributable to Dubin's individual claims. I also find no basis for a multiplier on fees incurred prior to the filing of the class complaint.

■ For the post-class complaint period, I must subtract $28,107.50 for work performed on Dubin's individual claims. Apart from this adjustment, I find that the fees during this period were reasonably incurred on behalf of the class, and are properly compensable from the settlement fund. With respect to Mehle's request for a risk multiplier, I find that Mehle deserves "some consideration for the risks and uncertainties" of pursuing claims for awarded but not granted shares under a novel application of the federal securities laws. *Agent Orange,* 818 F.2d at 236. I further find that this action "worthy of judicial encouragement," *Agent Orange,* 818 F.2d at 236, and that the award of a multiplier in this case will not "provide an incentive for counsel to flood 'the courts with unmeritorious litigation'," *Agent Orange,* 818 F.2d at 236 (quoting *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1392 (7th Cir.1984). I therefore award a risk multiplier of 1.25, which I find provides reasonable and adequate compensation to Mehle for prosecuting this case on a contingency basis for nearly six years, and provides sufficient incentive to other attorneys to prosecute actions that enforce the public policies underlying the federal securities laws.

■ KDW's fee application is deficient in several respects. First, the records submitted to the court do not identify which attorney or other employee performed which activities. Second, the hourly rate charged by each attorney/employee has not been provided (although I have been able to calculate it based upon summary information showing the total hours worked by certain individuals

---

**28.** I recognize that these fees exceeds the amount Dubin received in settlement of his individual claims. This simply demonstrates that those claims were not economically viable. Despite the net loss to Dubin on his individual claims, the cost of pursuing marginal claims cannot be shifted to the class.

and the total amount charged for their services). Finally, KDW has provided no information whatsoever regarding the qualifications and experience of the KDW attorneys who worked on this case. These deficiencies make it difficult, if not impossible to assess the reasonableness of the hours expended and the hourly rate charged for any particular activity. *See Grinnell I*, 495 F.2d at 473; *Kronfeld*, 129 F.R.D. at 602, 605–06. I am also troubled by the fact that KDW seeks fees for services performed over a 14–month period ($267,336.70) that total over 40% of Mehle's fees for more than five years ($653,275). Based upon the deficiencies in the fee application, the failure to allocate any fees to Dubin's individual claims, and generally excessive fees in relation to the work performed over a limited period, I find that a reduction of 25% of KDW's lodestar is required to reflect fees reasonably incurred on behalf of the class. I also decline to award any multiplier to KDW, which entered the case less than a year before the parties signed a Memorandum of Understanding, and performed most of their work during a period when a favorable settlement was highly likely if not virtually assured. Under these circumstances, any multiplier for KDW is wholly unwarranted.

I therefore award pre-settlement fees to Mehle and KDW, and pre-settlement expenses to Dubin as follows:

Mehle:

| | |
|---|---|
| Pre-class complaint fees (through August 1988) $91,125 less $13,668.75 | $ 77,456.25 |
| Post-class complaint fees (September 1988–June 15, 1993) $562,150 less $28,107.50 | $534,042.50 |
| Multiplier (1.25) on post-class complaint fees | $133,510.62 |
| Total fee award to Mehle | $745,009.37 |
| KDW: 75% of $267,336.70 | $200,502.52 |
| Total fees to <u>Dubin</u> counsel | $945,511.89 |

This fee award is approximately 23% of the class settlement ($4,128,674.50).

| | |
|---|---|
| Dubin (expenses): | $ 87,562.41 |

*Post–Settlement Fees and Expenses*

 As noted above, I have by previous orders awarded $7,300 in fees to Mehle and $14,502 for expenses incurred in the administration of the settlement. Currently outstanding is Mehle's October 20, 1993 letter application for fees and expenses of $18,028.01 for August 1993, and $5,508.61 for September 1993, and KDW's October 20, 1993 application for fees and expenses totalling $29,564.22 for July, August, and September 1993. I find that these fees and expenses were reasonably incurred, and chargeable to the class, except for fees attributable to opposing the application for fees by *Harris* and *Kaplan* class counsel. *Dubin* counsel's opposition to that request conferred no benefit on the *Dubin* class; indeed, any expenses incurred in opposing the application are the result of the counsel's regrettable failure to make any effort to reach a reasonable accommodation on an allocation of fees with *Harris* and *Kaplan* with respect to the overlapping shares. Based upon my review of the time records, approximately $17,500 (70 hours) of Mehle's fees for August and September and $12,400 (40 hours at Golden's hourly rate) of KDW's fees for August and September are attributable to this issue. I therefore award fees and expenses pursuant to the October 20, 1993 letter applications as follows: Mehle: $6,036.62; KDW: $17,164.22.

V

*THE FEE APPLICATION BY HARRIS AND KAPLAN COUNSEL*

*Applicable Law*

 It is well established that under the common or equitable fund theory, "claims may be filed not only by a party to the litigation, but also by an attorney whose actions conferred a benefit upon a given group or class of litigants." *Grinnell I*, 495 F.2d at 469; *see also, County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1326 (2d Cir.1990); *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045 (2d Cir.), *cert. denied*, 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973); *In re Fine Paper Antitrust Litigation*, 98 F.R.D. 48, 117–18 (E.D.Pa.1983), *modified on other grounds*, 751 F.2d 562 (3d Cir.1984); *Kaplan* Memo at 3–6.

In *Long Island Lighting Co.,* Suffolk County and other rate payers brought suit against Long Island Lighting Co. ("LILCO"), alleging fraud. Following a verdict for plaintiffs, the district court granted judgment n.o.v. in favor of LILCO. Subsequently, a class settlement was reached. Suffolk County opposed the settlement and opted out. The district court approved the class action settlement and awarded attorney's fees to counsel for the other plaintiffs, but denied a fee application by Suffolk County. On appeal, the Second Circuit reversed the denial of fees to attorneys for Suffolk County. The court found that it was

> clear that the efforts of Suffolk's attorneys substantially benefitted the class. Suffolk's attorneys conducted, to the benefit of the class, virtually all of the pre-trial discovery and motion practice, including motions for class certification. Its counsel were the only plaintiff attorneys who conducted the two-month trial, which resulted in a jury verdict that, through the use of collateral estoppel, could have entitled the class to damages against LILCO of approximately $4.3 billion * * * if the verdict were reinstated on appeal.

*Long Island Lighting,* 907 F.2d at 1327. The court also noted that LILCO admitted that it had entered into settlement negotiations in part because it was afraid that the verdict might be reinstated. Finally, the court stated that Suffolk's attorneys were actively involved in the settlement negotiations. *Id.*

*Alpine Pharmacy* involved antitrust allegations directed against five corporate defendants concerning the marketing of antibiotic drugs. The plaintiffs, who were represented by the Committee of Counsel ("Committee"),[29] fell into three classes: 1) city, county and state government entities ("CSS"), some of whom were represented by the firm of Dickstein, Shapiro & Galligan ("Shapiro"); 2) wholesale and retail druggists ("druggists"); and 3) individual consumers. Prior to trial, defendants offered to settle the case for $100 million, with $60 million to go to the CSS plaintiffs and the remaining $40 million to be

divided among the other two classes. Eventually, the bulk of the plaintiffs agreed that the druggists should get $3 million and the consumers $37 million.

The druggists, however, objected, and Shapiro—who represented the CSS plaintiffs—took part in negotiations between the defendants and the Committee, aimed at satisfying the druggist class. Ultimately, the druggist class was awarded $3 million plus the interest from the escrow account that had accrued after the settlement had been reached and before there was a final order approving the settlement.

The court awarded fees to Shapiro out of the druggists fund, but denied a fee application by attorney Harry Rubenstein ("Rubenstein"), who represented a single class claimant, who had not filed his individual action before class consolidation. The district court rejected Rubenstein's argument that he deserved counsel fees because he had proved in an unrelated case that druggists do not uniformly take a certain percentage markup on antibiotics.

The Court of Appeals affirmed the award to Shapiro based upon the district court's finding that Shapiro's efforts were largely responsible for the creation of the fund allocated to the druggist class. The Court held that "it was only fair that those who benefitted from the firm's efforts ought to contribute to the allowance to counsel * * *." *Alpine Pharmacy,* 481 F.2d at 1057. The Court held that "the fact that the firm did not sue on behalf of that class presents no bar to an allowance out of the fund." *Id.*

The Court of Appeals also affirmed the denial of fees to Rubenstein. The court noted that when Rubenstein appeared in the case, he did so on behalf of his client, not on behalf of the class, and that Rubenstein had nothing to do with negotiating the settlement. The court stated that it was

> unable to perceive how this revelation is of any benefit to the class in this case. The class fund here is not a pot out of which all those who generally further the cause of druggists in our society are to be reward-

29. The district case was a consolidation of thirteen individual actions. The Committee was comprised of all counsel of record in the thirteen actions.

ed. In the absence of even the hint of a showing of some benefit to the class in this case, Rubenstein has no real claim to attorneys' fees.

*Id.* at 1054 (internal footnotes omitted); *see also Cranston v. Hardin,* 504 F.2d 566 (2d Cir.1974) (denying fee to attorney in related case who obtained favorable Supreme Court ruling); *but see, In re Fine Paper Antitrust Litigation,* 98 F.R.D. at 117–18 (finding direct benefit to the class and awarding fee from class settlement to attorneys who obtained a favorable ruling from the Ninth Circuit in a related case).

### The "Overlapping Shares"

Consideration of the *Harris* and *Kaplan* fee applications requires an understanding of the overlap between the *Dubin* class and the *Harris* and *Kaplan* classes. This overlap occurs with respect to uncompensated "granted" equity shares. Unfortunately, the parties are not entirely in agreement regarding the number of overlapping shares or the class (*Harris* or *Kaplan*) with which they overlap. I find, however, that differences among counsel are not sufficiently significant to warrant a time-consuming (and probably futile) attempt to resolve the apparent discrepancies. Accordingly, for purposes of addressing the fee application by *Harris* and *Kaplan* class counsel, I will accept the computations of *Dubin* counsel, as set forth at the fairness hearing. Tr. 21–53.

There are 33 members of the *Dubin* class holding approximately 167,153 unadjusted equity shares. Settlement Agreement, Ex. E at 4. According to figures presented by *Dubin* counsel at the September 8, 1993 hearing, there are at least 62,351 overlapping unadjusted shares (and, if Ritterreiser's entire 50,000 share hiring award was granted, another 25,000 unadjusted shares).[30] Excluding Ritterreiser (who would overlap with

*Harris* ), Mehle allocates seventeen (17) class members and 40,400 overlapping shares to *Harris* [31] and ten (10) class members and 24,951 overlapping shares to *Kaplan.*[32] The six (6) non-overlapping class members are Conroy (2400), Friedman (7576), Lill (7576), O'Hare (2500), Ritterreiser (25,000) and Wilson (25,000). Using Mehle's figures (and excluding Ritterreiser from *Harris* ) the overlapping shares represent approximately 39% of the unadjusted *Dubin* shares (*Harris* : 24% and *Kaplan* : 15%). Moreover, because most of the overlapping *Harris* and *Kaplan* plaintiffs did not sign releases, they represent an even larger percentage (approximately 50%) of the adjusted *Dubin* shares (*Harris* : approximately 33% and *Kaplan* : approximately 17%). Accordingly, at least 39%, and arguably 50%, of the settlement is attributable to overlapping shares.

### Benefits to Dubin Class Provided by Harris and Kaplan Counsel

In support of their applications, *Harris* and *Kaplan* counsel assert that they have provided services to the *Dubin* class as a whole and to the overlapping plaintiffs, including Dubin.

*Harris* counsel represented at least 17 of the 33 plaintiffs whose equity shares have been settled through *Dubin.*

According to *Harris* counsel, Dubin, as a *Harris* class member, called the Vladeck firm on numerous occasions during the course of the litigation. Vladeck Aff. ¶ 5. He requested and received copies of all the legal papers, including the class certification papers, and attended meetings held with *Harris* class counsel. *Harris* counsel represents that

> [a]t no time prior to the *Dubin* class certification motion did Dubin, or his counsel, inform *Harris* class counsel that his was

**30.** *Harris* class counsel claims at least 18 overlapping class members and 57,000 overlapping shares. Vladeck Aff. ¶ 8; *cf.* Tr. 23–24 (listing 17). *Kaplan* class counsel claims at least 6 overlapping class members and 15,500 shares. Lovell Aff. ¶ 3(a); Tr. 22.

**31.** Chamberlin (1500), Dubin (5000), Gordon (1800), Hoffman (2500), Kelly (5000), Litt (4500), Lowenstein (1500), Marren (1500), McCormick (1500), Partin (3000), Reiff (1500), Schrager (2500), Shumsky (1500), Slater (1500), Taylor (1800), Teman (2000), Tuft (1800). *See* Tr. 29–53.

**32.** Behler (4200), Burgin (1000), Gossens (1000), Idsal (2000), Mandy (1250), Sosnick (2000), Stoler (3000), Sykes (3000), Wallace (3334), Whiting (4167). *See* Tr. 29–53.

anything other than an individual case. Indeed, Dubin called *Harris* class counsel numerous times in early 1990, and asked questions concerning the mechanics of, and pros and cons of, class action status, including attorneys' fees, all in the context of being interested in and wanting to keep well informed about *Harris*. At no time did Dubin say that his inquiries were being used for *Dubin* class certification, which clearly they were.

Vladeck Aff. ¶ 5.

*Harris* counsel also states that during the more than five years that *Harris* counsel represented the overlapping class members whose shares are being settled through *Dubin*, "numerous hours were spent on pursuing their claims and responding to their inquiries. Documents, both produced in discovery by defendants and provided by class members, were reviewed, phone calls and letters responded to, and meetings were held at which many of these class members were present and participated." Vladeck Aff. ¶ 6. According to *Harris* counsel, "[m]any of the class members with overlapping claims said they were unaware of the *Dubin* case, and had never been informed of its progress either through Dubin or *Dubin* class counsel. These calls continued even *after Dubin* settled but before the official notice was sent to class members." Vladeck Aff. ¶ 6.

*Harris* counsel also assert that their work benefitted not only the overlapping class members, but the entire *Dubin* class, by conducting extensive discovery that "included depositions of virtually all of the key decisionmakers, board members, and advisors

involved in the merger," and which, when presented at the mini-trial held before Judge Broderick in March 1992, "made defendants for the first time take any of the three cases seriously, and set the stage for the rest of the settlement negotiations." [33] Vladeck Aff. ¶ 7.

*Kaplan* counsel points out that between March 1988, when *Kaplan* was certified as a class action, and July 1990, when the *Dubin* class was certified, at least six of the plaintiffs whose equity shares have been settled through *Dubin* [34] were represented solely by *Kaplan* counsel (the "Originally Exclusively *Kaplan* Class Members"). *Kaplan* counsel assert that they conferred and helped to confer numerous benefits on the Originally Exclusively *Kaplan* Class Members and on Dubin, Dubin's counsel, and the *Dubin* class generally. Lovell Aff. ¶ 3.

*Kaplan* counsel conducted fact investigation, retained an expert, and, as noted above, conducted extensive discovery in coordination with *Harris* counsel, much of which was completed before *Dubin* was filed, or was "proceeding as an individual action with Dubin and his attorney not certified to represent anyone else." Lovell Aff. ¶ 5. *Kaplan* counsel also assisted *Harris* counsel at the 2-day mini-trial. Lovell Aff. ¶ 5, ¶ 9 n. 4. *Kaplan* counsel provided documents and information to both Dubin and his attorney. Lovell Aff. ¶ 6 and Exs. A, B. [35] *See also* Schnell Aff. ¶¶ 5–13 (discussing entries pertaining to *Harris* and *Kaplan* and communications with

---

**33.** According to *Harris* counsel, "[l]iterally hundreds of hours were spent in preparation for the 2-day mini-trial. Documents were culled and reviewed for exhibits, all depositions were read and re-read, and jury charges were drafted and submitted to the Court." Vladeck Aff. ¶ 7.

**34.** Burgin, Gossens, Idsal, Mandy, Sosnick and Stoler. Lovell Aff. ¶ 3. Mehle identified four additional overlapping plaintiffs at the fairness hearing: Behler, Sykes, Wallace and Whiting. Tr. 29–30, 47–49.

**35.** *Kaplan* attorney Joseph J. Tobacco, Jr., was called by *Dubin* counsel for assistance and information about *Kaplan;* Tobacco "had at least one and perhaps several telephone conversations

with [Mehle] in 1988 about the status and substance of the *Kaplan* case and its relation to [*Dubin*]," when *Dubin* was still an individual action. Lovell Aff., Ex. A. at ¶ 3. Tobacco believes that he was "able to provide substantial information to plaintiff Dubin and his counsel." *Id. Kaplan* attorney Jared B. Stamell "spoke to Mr. Dubin after he called my office. He asked for information about the status of our case and for our assistance in his own suit, which, as I recall, had recently been filed," at which time "he was acting individually and had not considered a class action." Lovell Aff. Ex. B ¶ 2. Stamell believes that "Mr. Dubin amended his case to be a class action based on the assistance and information he obtained from us." *Id.*

*Harris* and *Kaplan* counsel in *Dubin* counsel's time records).[36]

In addition to conducting discovery, providing documents and information, and obtaining a highly successful result in the mini-trial, *Harris* and *Kaplan* counsel obtained increasing favorable settlement offers over a period of time when there concededly had been no significant settlement discussions in *Dubin*.

### Discussion

■■■ Dubin and Mehle oppose any fee award to *Harris* or *Kaplan* counsel. The essence of their opposition is that neither *Harris* nor *Kaplan* counsel "did anything of value for *Dubin* class counsel or for Dubin himself to aid them in pursuit of the *Dubin* class claim." *Dubin* Opp. Memo at 22–28. They contend that their communications with *Harris* and *Kaplan* counsel were few and largely non-substantive, that there was no shared discovery, and that "the few documents they furnished were filings publicly available from the court docket files; their furnishing of them was no more than a courtesy" (*Dubin* Opp. Memo at 23). *See Dubin* Opp. Memo at 23–28. They assert that the mini-trial "was of no legal consequence to the *Dubin* class and thus conferred no benefit on it," because "none of the controlling legal or factual issues in the cases are the same." *Dubin* Opp. Memo at 15–16. Moreover, Mehle contends that *Dubin* settled not because of the mini-trial, but because the trial date was imminent and defendants did not want to try *Dubin*. *Dubin* Opp. Memo at 17.

Finally, Mehle argues that the legal authority relied upon by *Harris* and *Kaplan* counsel (some of which is discussed above) does not support their entitlement to compensation because the attorneys in the cited cases provided services in pursuit of the *same claim* as that of the settling class.[37] *Dubin* Opp. Memo at 18–20. By contrast, Mehle points out, the *Dubin* class asserted a federal securities claim, while the *Harris* and *Kaplan* classes asserted common law contract and tort claims.[38] *Dubin* Opp. Memo at 15–16.

Turning first to *Dubin* counsel's legal objection, I reject the argument that *Harris* and *Kaplan* counsel are precluded from recovering a fee award in *Dubin* because the *Harris* and *Kaplan* cases are based on a different legal theory. Although the cases relied upon by *Harris* and *Kaplan* counsel involve awards to counsel who apparently[39] sued on the same claim, none of the cases holds or suggests that an attorney whose work benefits a group or class, and whose work has helped to create a settlement fund, is *prohibited* from obtaining a reasonable fee. In fact, as noted above, at least one court has awarded a fee for work done in a related case. *See, In re Fine Paper Antitrust Litigation*, 98 F.R.D. at 117–18. I am unpersuaded that *Cranston v. Hardin* requires denial of the application by *Harris* and *Kap-*

---

**36.** Dubin and Mehle contend that *Harris* and *Kaplan* counsel have overstated the substance and extent of their communications with each other, and the value of those communications to the prosecution of *Dubin*. *See* Dubin Opp. Aff. ¶¶ 3–27 and Mehle Opp. Aff. ¶¶ 5–11. Because, as set forth below, the contacts between *Harris* and *Kaplan* counsel and Dubin and Mehle, are not a major factor in my fee award to *Harris* and *Kaplan* counsel, I find it unnecessary to discuss or resolve the differing versions of these communications.

**37.** Mehle also opposes the applications by *Harris* and *Kaplan* counsel because they would result in a reduction of the net recovery projected in the notice to the class, and upon which *Dubin* class members determined whether or not to object to the settlement. This contention is meritless in light of the representation by *Harris* and *Kaplan* counsel that they seek only a portion of the fee sought by *Dubin* counsel. *See* Tr. 25–26.

**38.** Mehle also complains that *Harris* and *Kaplan* counsel have failed to provide detailed billing that relates the services for which they seek compensation specifically to the overlapping plaintiffs or to the procurement of the *Dubin* settlement. *Dubin* Opp. Memo at 14. In light of Mehle's failure to make any effort to detail the activities devoted to Dubin's individual claims, Mehle is in a poor position to criticize *Harris* and *Kaplan* counsel for failing to perform a far more difficult task. In any event, the application by *Harris* and *Kaplan* counsel is essentially based on a percentage-of-recovery approach for which a detailed billing presentation is not necessary.

**39.** The reported opinions in a number of these case do not reveal whether different claims or legal theories were pressed by the fee applicants.

*lan* counsel. *Cranston,* in which the court affirmed the denial of a fee to an attorney who obtained a favorable Supreme Court decision in a related case, is distinguishable in several respects. First, in contrast to the fee applicant in *Cranston,* who was not counsel to any of the parties in that case, *Harris* and *Kaplan* counsel have represented close to 80% of the *Dubin* plaintiffs. Second, the fee applicant in *Cranston* obtained the favorable ruling in a case involving different parties and facts, whereas *Harris* and *Kaplan* are based on facts identical to *Dubin.* Third, the rejected fee application in *Cranston* was based solely upon the Supreme Court ruling, and the applicant was found to have "conferred no significant benefit on any class." *Cranston v. Hardin,* 504 F.2d at 579. By contrast, *Harris* and *Kaplan* counsel concededly rendered legal services to the overlapping plaintiffs, and for the reasons set forth below, I find benefitted not only the overlapping plaintiffs, but the *Dubin* class as a whole. Finally, it appears that the *Cranston* court was also influenced by its conclusion that the fee applicant actually increased expenses by his repetitious and "petulant" efforts to intervene or have the suit dismissed on frivolous grounds. *Id.* at 580. There is no allegation that *Harris* or *Kaplan* counsel acted in any way to increase the expenses in *Dubin.*

### Benefit to the Overlapping Plaintiffs

As *Dubin* counsel has acknowledged, over 80% (27/33) of the *Dubin* plaintiffs (representing at least 40% of the *Dubin* shares) are also plaintiffs in *Harris* or *Kaplan.* It is simply indisputable that these plaintiffs received legal services from *Harris* and *Kaplan* counsel in connection with claims that have been settled (released) in *Dubin.* These plaintiffs should not receive a "free ride" for this representation at the expense of their co-plaintiffs.

### Benefit to the Dubin Class as a Whole

Dubin's protestations notwithstanding, I am persuaded that he obtained information from *Harris* counsel—ostensibly as a *Harris* class member, and conveyed information to *Dubin* counsel that was directly or indirectly

useful in the prosecution of *Dubin,* and therefore benefitted the *Dubin* class as a whole. *See* Vladeck Aff. ¶ 5. However, in light of the fact 1) that Mehle did not have access to the discovery conducted in *Harris* and *Kaplan* (except in so far as it may have been disclosed in publicly filed documents), 2) that *Dubin* involved different legal claims, and 3) that communications between Mehle and *Harris* and *Kaplan* counsel were for the most part non-substantive, I do not find that *Harris* and *Kaplan* counsel provided substantial benefit to the *Dubin* class as a whole through discussions with or by providing documents to Mehle and/or Dubin.

I do find, however, that *Harris* and *Kaplan* substantially benefitted the *Dubin* class and contributed significantly to the *Dubin* settlement by the efforts that resulted in earlier settlement offers and by the successful prosecution of the *Harris* mini-trial. As *Harris* counsel points out, the mini-trial "catapulted settlement discussions to a new level" prior to any significant settlement discussions between defendants and *Dubin* counsel. Vladeck Aff. ¶ 7. When the $12 million offer was made to settle all three cases, *Harris* and *Kaplan* counsel had represented the overlapping plaintiffs for over four years; the overlapping plaintiffs had been represented by *Dubin* counsel for less than two years (since July 1990). Moreover, when this offer was rejected by *Harris* and *Kaplan* counsel, defendants acknowledged that more money would be necessary to settle these cases, and expressed a willingness to continue negotiations and, at least to some extent, improve their offer. Accordingly, when the separate settlement discussions in *Dubin* began in the late spring of 1992, the starting point had been largely established by the efforts of *Harris* and *Kaplan* counsel. As *Kaplan* counsel points out, the defendants' May 1992 offer of $12 million for all three cases is over 40% of the combined settlements ($28,672,000) eventually achieved. Lovell Aff. ¶¶ 25–26. While it is undoubtedly true that *Dubin* settled first in part because of the imminent trial date,[40] the prior settlement efforts by *Harris* and *Kaplan* counsel,

---

**40.** Defense counsel did not view the trial date as imminent, but was concerned about "the exorbi-

tant expense of preparing as if there were a trial date." *See* Tr. 127.

and the successful *Harris* mini-trial indisputably influenced the amount of the settlement for the reasons previously stated. Moreover, the amount of the settlement was increased by the fact that the *defendants* were paying to settle not only the *Dubin* claims, but also the *Harris* and *Kaplan* claims to the extent of the overlapping shares (at least 40% of the shares being settled).

In sum, I find that *Harris* and *Kaplan* counsel conferred a benefit upon the overlapping plaintiffs and the *Dubin* class as a whole, and that they are entitled to be compensated from the *Dubin* settlement fund.

### Amount to be Awarded to Harris and Kaplan Counsel

Having found that *Harris* and *Kaplan* counsel are entitled to compensation, I turn to the considerably more difficult task of determining an appropriate fee award. *Harris* counsel seek an award of $250,000. Any fees recovered in this action by *Harris* counsel will be distributed *pro rata* to *Harris* class members. *See* Vladeck Aff. ¶ 2; *Harris* Memo at 5–6. *Kaplan* counsel seek an award of $85,000, which has already been deducted from the fee requested and awarded in *Kaplan* itself. *See* p. 1012, *supra.*

### The Harris Request

According to *Harris* counsel, the number of *Harris* shares being settled through *Dubin* is about 10% of the total number of shares settled in *Harris*. Vladeck Aff. ¶ 8. Accordingly, *Harris* counsel seek a fee award of $250,000, which represents 10% of the fee requested and awarded in *Harris* (Vladeck Aff. ¶ 8). The *Harris* fee request represents 6% of the *Dubin* class settlement ($4,128,-674.50) in *Dubin*; 18% of the pre-settlement fees requested by *Dubin* class ($1,380,-917.50); and 26% of the pre-settlement fees awarded above ($945,511.89).

### The Kaplan Request

The request by *Kaplan* counsel is based on a different analysis. They seek "an appropriate portion of the benefits already 'in the bank' for the overlapping class members

when *Dubin* counsel took up the baton and completed the race." Lovell Aff. ¶ 30.

For purposes of comparison with the *Harris* methodology, I note that, according to *Kaplan* counsel, 143,000 equity shares have been settled through *Kaplan*. The overlapping shares being settled through *Dubin* represents between 11% and 17% of the total *Kaplan* shares (17% if there are 24,951 overlapping shares; 11% if there are 15,500 overlapping shares). The *Kaplan* fee application in *Dubin* represents 4% of the total fees sought in *Kaplan;* however, this percentage cannot properly be compared with *Harris,* because a significant portion of the *Kaplan* settlement is attributable to equity option claims. The *Kaplan* fee request represents 2% of the class settlement in *Dubin* ($4,128,-674.50); 6% of the pre-settlement fees requested by *Dubin* counsel ($1,380,917.50); and 9% of the pre-settlement fees awarded above ($945,511.89).

I agree with *Harris* and *Kaplan* counsel that an appropriate fee award in this case is properly determined on a percentage-of-recovery basis; indeed, I find that it is the only workable approach in this unusual situation. Based upon the number of overlapping shares, and the work that led to the $12 million settlement offer in May 1992 (particularly the successful prosecution of the mini-trial), I find that the benefits conferred on the *Dubin* class by *Harris* and *Kaplan* counsel fully warrant a fee award of 8% of the *Dubin* settlement fund. I note that this brings the total fee award to 31% of the class settlement, which I find to be reasonable, and which will result in some additional distribution to the members of the *Dubin* class that will bring their net recovery closer to that of the *Harris* and *Kaplan* plaintiffs, thus addressing to some extent an equity issue acknowledged by all counsel during the joint settlement discussions.[41]

### CONCLUSION

Fees and expenses are awarded from the settlement fund as follows: *Pre-settlement:* Dubin: $87,562.41; Mehle: $745,009.37;

---

41. Although a precise calculation is not possible, I also believe that this fee award roughly approximates the additional amount that *Harris* and *Kaplan* counsel would have received if the fees attributable to the overlapping plaintiffs had been equitably divided with *Dubin* counsel.

KDW: $200,502.52; *Harris* counsel: $250,-000; *Kaplan* counsel: $85,000. *Post–Settlement:* Mehle: $6,036.62; KDW: $17,164.22.

SO ORDERED: